UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Newport News Division)

| | |
|---|---|
| In re LUMBER LIQUIDATORS HOLDINGS, ) INC. SHAREHOLDER DERIVATIVE LITIGATION | Civil Action No. 4:15-cv-00016-AWA-LRL |
| This Document Relates To: | SHAREHOLDER DERIVATIVE ACTION |

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY OF LOYALTY, CORPORATE WASTE, UNJUST
ENRICHMENT AND CONSPIRACY**

# TABLE OF CONTENTS

**Page**

I.  OVERVIEW OF THE ACTION ....................................................................................1

II.  JURISDICTION AND VENUE ...................................................................................10

III.  THE PARTIES...............................................................................................................11

IV.  THE FIDUCIARY DUTIES OF LUMBER LIQUIDATORS' DIRECTORS AND OFFICERS......................................................................................................................14

V.  AIDING AND ABETTING AND CONCERTED ACTION ..........................................20

VI.  FACTUAL ALLEGATIONS .......................................................................................21

    A.  Lumber Liquidators' Violations of Federal Law and Other Rules and Regulations .......................................................................................................21

        1.  Formaldehyde Emissions ...................................................................22

        2.  Illegal Timber Harvesting and Import ......................................................30

VII.  DEFENDANTS' BREACH OF LOYALTY (AND CANDOR AND GOOD FAITH) .........................................................................................................................38

    A.  Defendants' False and Misleading Statements and Omissions.............................40

    B.  Defendants Caused the Company to Repurchase Stock at Artificially Inflated Prices ......................................................................................................46

    C.  The Individual Defendants' Unjust Compensation................................................48

VIII.  DAMAGE TO LUMBER LIQUIDATORS ..................................................................51

IX.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ......................................52

    A.  Demand Is Excused Because the Conduct of Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade Was Not a Valid Exercise of Business Judgment.................................................................................53

    B.  Demand Is Excused Because Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade Each Face a Substantial Likelihood of Liability Resulting from Their Misconduct ..........................................................57

    C.  Defendants Presley, Moore, Roper and Wade Face a Substantial Likelihood of Liability as Audit Committee Members..........................................58

    D.  Defendants Roper, Brock and Robinson Face a Substantial Likelihood of Liability as Compensation Committee Members ..................................................60

**Page**

E.      Demand Is Futile as to Defendant Lynch .............................................................62

F.      Demand Is Futile as to Defendant Sullivan .........................................................62

G.      Demand Is Futile for Additional Reasons.............................................................63

COUNT I ...................................................................................................................................65

COUNT II ..................................................................................................................................66

COUNT III.................................................................................................................................67

COUNT IV.................................................................................................................................67

COUNT V ..................................................................................................................................69

X.      PRAYER FOR RELIEF ................................................................................................70

XI.     JURY DEMAND ...........................................................................................................71

## I.      OVERVIEW OF THE ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant Lumber Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company") against its Board of Directors (the "Board") and certain of its current and former top officers for breach of fiduciary duty, abuse of control, corporate waste, unjust enrichment and conspiracy.  Defendants include Macon F. Brock, Jr., Douglas T. Moore, John M. Presley, Peter B. Robinson, Martin F. Roper, Thomas D. Sullivan, Jimmie L. Wade and Nancy M. Taylor (together, the "Lumber Liquidators Board Members"), Senior Vice President, Supply Chain, Carl R. Daniels, Lumber Liquidators' former Chief Financial Officer ("CFO"), Daniel E. Terrell, former Chief Merchandising Officer, William K. Schlegel, former Chief Executive Officer ("CEO"), Robert M. Lynch and his predecessor, Jeffrey W. Griffiths (the Lumber Liquidators Board Members, Terrell, Daniels, Schlegel and Griffiths are referred to collectively as the "defendants").

2.      Lumber Liquidators is a multi-channel specialty retailer of hardwood flooring and hardwood flooring enhancements and accessories.  The Company purports to offer an extensive assortment of exotic and domestic hardwood species, engineered hardwoods and laminates direct to the consumer.  The Company also features renewable flooring products, bamboo and cork, and provides a wide selection of flooring enhancements and accessories, including moldings, noise-reducing underlay, adhesives and flooring tools.

3.      Lumber Liquidators sources its wood flooring products directly from mills, many of which are located in China, allowing the Company to avoid the need for middlemen or distributors. As a result of this business strategy, which fostered direct contact and supervision between the Company and the mills from which its products were obtained, the defendants named herein were acutely aware, or were recklessly unaware, of where the mills obtained the wood used to create Lumber Liquidators' products as well as the process employed by the mills to create those products.

4.      From at least 2007 through 2011, Lumber Liquidators and its top competitors, The Home Depot Inc. ("Home Depot") and Lowe's Companies Inc. ("Lowe's"), each reported gross margins for similar wood flooring products of roughly 34% to 35% per year.  However, while Home Depot's and Lowe's gross margins generally remained in this narrow range, in 2012 Lumber Liquidators' gross margins began dramatically increasing, reaching 41.8% by the third quarter of 2013.  Defendants knew, or were reckless in not knowing, that these dramatic and sudden above-market profit margins could not have been attained without purchasing illegally sourced or non-compliant wood products.

5.      Beginning at least as early as 2011, defendants caused the Company to engage in the purchase and sale of illegally sourced lumber from protected Russian forests in violation of the Lacey Act (16 U.S.C. §§3371-3378) and to purchase and sell Chinese-made laminate flooring products containing toxic levels of formaldehyde in violation of the California Air Resources Board's Regulations ("CARB Regulations") (17 C.C.R. §§93120-93120.12) and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health and Safety Code §25249.5, *et. seq.*) ("Proposition 65"), and in excess of the federal guidelines set forth in the Formaldehyde Standards for Composite Wood Products Act (the "FSCWP Act"), signed into law on July 7, 2010 (15 U.S.C. §§2601, 2697).  Defendants then caused Lumber Liquidators to falsely label these products as CARB Phase-2 compliant.

6.      The CARB Regulations, which have been in effect since January 1, 2009, establish limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard and particleboard.  CARB Regulations dictate that all HWPW (Hardwood Plywood) products sold in the State of California should emit no more than 0.05 parts per million ("ppm") of formaldehyde.  The national emission standards in the Environmental Protection Agency's ("EPA") proposed rules implementing the FSCWP Act standards mirror the previously

- 2 -

established CARB Regulations. *See* 40 C.F.R. Part 770; 78 F.R. 34820, 44089, 51695, and 79 F.R. 19305.

7.     The Lacey Act is a conservation statute that was signed into law on May 25, 1900. The Lacey Act is designed to protect plants and wildlife by imposing civil and criminal penalties for a wide array of violations prohibiting trade in wildlife, fish and plants that have been illegally taken, transported or sold. The Lacey Act was amended in 2008 to add provisions banning the import and trade of illegally sourced wood products (including wood products sourced in violation of foreign laws)[1] and imposing civil and criminal penalties on violators. Among other things, the Lacey Act requires that importers evaluate their own supply chains and take reasonable and prudent measures to exclude illegally cut wood. The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment. The provisions of the Lacey Act are primarily enforced by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").

8.     As corporate directors and officers, defendants owe Lumber Liquidators fiduciary duties – the highest duties known to the law. These duties include a fiduciary duty of loyalty (and its subsidiary duties of candor and good faith), in the management and administration of the Company's affairs, as well as in the use and preservation of Lumber Liquidators' property and assets. Delaware law holds: "The affairs of Delaware corporations are managed by their board of directors, who owe to shareholders duties of *unremitting* loyalty. This means that their actions must be taken in the good faith belief that they are in the best interests of the corporation and its stockholders, especially

---

[1]     Russian law regulates the harvesting of wood in excess of stated permits and outside designated areas. As a result, importing such wood to the United States is a violation of the Lacey Act.

where conflicts with the individual interests of directors are concerned. . . .   When those same directors communicate with shareholders, they also must do so with ***complete candor***.  Loyalty.  Good faith.  Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives.  Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor."  *In re Tyson Foods, Inc., Consolid. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007) (emphasis in original, footnotes omitted).

9.      Defendants breached their fiduciary duty of loyalty by adopting, implementing, and condoning a business strategy based on illegal activities over several years.  These illegal activities included buying and selling hardwood flooring from Chinese mills in violation of the Lacey Act, the FWCWP Act, CARB Regulations and other environmental rules and regulations.

10.      In relation to the aforementioned Lacey Act and CARB Regulations, Lumber Liquidators' directors and officers had a known duty to act, *i.e.*, to cause the Company to comply with these laws.  Nevertheless, defendants consciously failed to act, *i.e.*, did not stop these illegal purchases and caused the Company to comply with the law.  As a result, Lumber Liquidators imported, manufactured, sold and distributed Chinese Flooring that emits excessive levels of formaldehyde, which is categorized as a known carcinogen by the United States National Toxicology Program and the International Agency for Research on Cancer, in direct violation of the CARB Regulations.  Defendants additionally allowed the Company to import, manufacture, sell and distribute wood flooring that is illegally sourced through China and other countries (including Russia), threatening critical habitat and endangered species, in violation of the Lacey Act.  Both actions were in direct contrast to repeated representations by the Company to the contrary.

11.      Had the Lumber Liquidators Board Members chosen to act to cause the Company to comply with applicable laws and regulations, as their fiduciary duty of loyalty required, these

- 4 -

violations of environmental and consumer protection laws most likely would not have occurred. The Lumber Liquidators Board Member's conscious failure to act, when faced with a known duty to act, breached their fiduciary duty of loyalty (and good faith) owed to Lumber Liquidators by each and every Board Member. As a result, each Lumber Liquidators Board Member is personally liable to Lumber Liquidators for the damages resulting from their misconduct.

12. The Lumber Liquidators Board Members also breached their fiduciary duties of loyalty (and candor) by making false and misleading statements to Lumber Liquidators shareholders in the Company's shareholder reports. For example, Lumber Liquidators' Annual Reports on Securities and Exchange Commission ("SEC") Form 10-K for 2011, 2012, 2013 and 2014 artificially inflated Lumber Liquidators' publicly reported financial results because they failed to disclose that the Company was selling illegally sourced and toxic products to its customers in violation of rules and regulations designed to protect the environment and consumers.

13. Defendants' fiduciary failures have already caused significant harm to the Company. For example, on September 26, 2013, federal law enforcement officials from the United States Department of Immigration and Customs Enforcement's Homeland Securities Investigations unit, together with agents from the DOJ and FWS, raided the Company's corporate offices in Toano and Richmond, Virginia. These federal agents were seeking information related to the Company's importation of illegal wood products from protected forests in the Russian Far East ("RFE") in violation of the Lacey Act.

14. Moreover, as a result of defendants' breaches of their fiduciary duties, the Company is now subject to more than 100 complex and expensive class action lawsuits alleging violations of federal securities laws, CARB Regulations; the Lacey Act; the Racketeer Influenced & Corrupt Organizations Act ("RICO"); the Magnuson-Moss Warranty Act; breach of express and implied warranties; violation of Consumer Protection/Deceptive Practices acts; unjust enrichment; and

- 5 -

lawsuits alleging violations of California's Proposition 65.  On March 10, 2015, *The New York Times* reported that the Attorney General of New York, Eric T. Schneiderman, had opened an inquiry into whether the Company violated safety standards and that officials in California are also likely to investigate.

15.     Defendants' fiduciary failures have also exposed the Company to criminal charges. On February 25, 2015, the Company announced in its Form 10-K for the fiscal year ended December 31, 2014, that "[i]n recent communications, the DOJ indicated that it is contemplating seeking criminal charges under the Lacey Act. . . .   At this time, the Company does not have enough information to estimate a reasonably possible loss or range of loss that may result from actions by the DOJ as a result of its investigation."

16.     On March 1, 2015, *60 Minutes*, an American newsmagazine television program broadcast on the CBS television network, aired a show revealing that the Company was selling laminated flooring made in China that failed to meet California and federal health and safety standards because it contained high levels of formaldehyde.  The program indicated that the average level of formaldehyde in Lumber Liquidators' products was six to seven times above the State of California's permissible emission limitations, and that some samples were close to 20 times above the level that is allowed to be sold.  *60 Minutes* hired investigators who posed as buyers to visit three of the Company's factories in China.  All three admitted they were labeling Lumber Liquidators' product as CARB Phase-2 compliant, *i.e.,* compliant with California's formaldehyde emissions regulations when they knew the product was non-compliant.  *See* http://www.cbsnews.com/news/lumber-liquidators-linked-to-health-and-safety-violations/.

17.     On April 15, 2015, defendants were saddled with the attorneys' fees and costs for the environmental group Global Community Monitor's ("GCM") litigation regarding the Company's formaldehyde laced flooring.  According to media reports, the "court battle stemmed from a

Proposition 65 lawsuit GCM filed last year against the company for high levels of cancer-causing formaldehyde found in Chinese-made laminate flooring sold by the company." Lumber Liquidators responded with a defamation lawsuit which was struck down under California's anti-SLAPP statute which allows the "'early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" The Court found that GCM is entitled to recover attorney's fees and costs incurred in its defense of the meritless SLAPP suit.

18.     On April 29, 2015, the Company filed a Form 8-K with the SEC announcing that defendant Terrell, the CFO, had resigned. The April 28, 2015 severance agreement between defendant Terrell and the Company affords lucrative and unjustified benefits to defendant Terrell. For example, for the three-month period following the June 1, 2015 effective date of defendant Terrell's resignation, he will remain a "consultant" to the Company and will be paid his regular base pay of nearly $7,000 per week, enjoy all health and employee benefits, and retain the status of an employee for purposes of existing Option and Restricted Stock Agreements. When defendant Terrell's lucrative "consulting" agreement ends, he will receive another year's pay and health benefits.

19.     In addition, defendant Terrell's severance agreement has a "Confidentiality" provision that significantly restricts his ability to disclose or discuss so-called "Confidential Information" which is broadly defined. This provision appears to limit defendant Terrell's ability to testify regarding the Company's past violations of federal laws or regulations.

20.     Things have spiraled further down since defendant Terrell's resignation.

21.     On April 29, 2015, Lumber Liquidators issued its quarterly report on Form 10-Q with the SEC and revealed that the DOJ "indicated that it is seeking criminal charges under the Lacey Act." The document went on to state that the Company has reserved at least $10 million to account

for future losses associated with the DOJ investigation into Lacey Act violations.  It also revealed that the Company now faces more than 100 class actions related to violations of the Lacey Act and formaldehyde laws and regulations.  These stunning revelations wiped out more than $34 million in shareholder equity.

22.     On May 7, 2015, the Company announced that it would suspend sales of its laminate flooring from China and would conduct a review of its suppliers to ensure compliance with federal and state laws.  In addition, the Company announced that it had paid to send over 15,000 home testing kits designed to identify airborne formaldehyde.  The Company looked at results from 3,400 tests and claimed that 97% of those kits "indicated indoor air concentrations of formaldehyde . . . within . . . the World Health Organizations" ["WHO"] acceptable limits.

23.     However, the Company's claims regarding its home testing kits have since been called into question by the United States Environmental Protection Agency ("EPA").  For example, the EPA website explains that home air testing "may not provide useful information due to the uncertainties" of the method.  The EPA pointed out that air testing does not pinpoint the specific source of a contaminant, and there are no widely accepted standards for indoor formaldehyde levels.

24.     The EPA also noted that there were numerous errors in letters defendants caused Lumber Liquidators to send to customers who had completed the formaldehyde tests.  For example, the Company cited a "recent study" from the EPA to reassure customers, but that research was an outside study that was referenced in an agency document and does not represent an EPA conclusion.  This is especially problematic because the EPA does not have standards on formaldehyde exposure, but is finalizing rules first proposed in 2013.

25.     Moreover, defendants' claim that 97% of the test kits it analyzed showed formaldehyde levels within WHO limits was, at best, misleading.  According to a June 5, 2015 *Bloomberg* article, the "WHO's guidelines are for indoor levels of formaldehyde to be lower than

- 8 -

about 0.08 parts per million, regardless of exposure time." But the letter defendants caused the Company to send test kit recipients stated that the formaldehyde levels in the tested homes were within or below the "normal" range of 0.02 to 0.10 ppm – higher at the top end than is allowed under WHO guidelines. Moreover, countries that do have regulations in place offer much lower exposure guidelines. Canada, for example, sets exposure guidelines at 0.1 ppm for one hour and 0.04 ppm for longer than eight hours.

26.     On May 21, 2015, shareholders were shocked to learn that the Company's CEO, defendant Lynch, had abruptly left the Company. Defendants did not provide any explanation for defendant Lynch's departure. This surprising news cost shareholders another $112.9 million in lost shareholder equity.

27.     Shareholders were hit with another surprise when on June 2, 2015, prominent investor Whitney Tilson claimed that Ray Cotton, Vice-President and Chief Compliance and Sustainability Officer left the Company in May 2015. However, defendants failed to disclose Cotton's departure. Only after being publicly exposed by Tilson did defendants finally, on June 3, 2015, admit that Cotton had stepped down.

28.     Defendants most recently terminated and replaced the Company's Chief Merchandising Officer, defendant Schlegel on June 15, 2015. The Company announced defendant Schlegel's termination in a Form 8-K filed with the SEC, but provided no explanation about why he was terminated. According to several news reports that day, the Company refused to comment about the reasons for defendant Schlegel's firing.

29.     Although Lumber Liquidators has been severely injured, defendants have not fared nearly so badly. During the relevant time period, defendants collectively pocketed millions in salaries, fees, stock options, illicit insider trading profits and other payments that were not justified

in light of the violations of state and federal law at Lumber Liquidators that occurred on their watch. These payments wasted valuable corporate assets and unjustly enriched defendants.

30.     Notwithstanding the enormous damage to Lumber Liquidators arising from the violations of federal law, the Company's Board has not and will not commence suit against defendants for breach of loyalty, corporate waste and/or unjust enrichment, let alone vigorously prosecute such claims.  By this action, plaintiffs seek to vindicate Lumber Liquidators' rights against its wayward fiduciaries.

## II.     JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1), because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     This Court has personal jurisdiction over each defendant named herein because each defendant is a corporation that conducts business in and maintains its principal place of business within this District, an individual who is a citizen of the Commonwealth of Virginia resident in this District, or an individual who is a citizen of another state and is subject to jurisdiction in the Commonwealth pursuant to the Virginia "long arm" jurisdictional statute, Va. Code Ann. §8.01-328.1, and has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.[2]

---

[2]     In particular, each of the individual defendants in this action is either (a) a citizen of the Commonwealth of Virginia resident in this District, or (b) a citizen of another state who has subjected himself or herself to jurisdiction in this Commonwealth by transacting business in this Commonwealth, Va. Code Ann. §8.01-328.1 A 1, contracting to supply services in this Commonwealth, *id*. §8.01-328.1 A 2, causing tortious injury by acts or omissions in this Commonwealth, *id*. §8.01-328.1 A 3, and/or causing tortious injury in this Commonwealth by acts or omissions outside this Commonwealth and regularly doing or soliciting business, or engaging in

- 10 -

33.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because: (i) Lumber Liquidators maintains its executive offices and principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lumber Liquidators, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.  Venue is proper in this division of the Court pursuant to Local Civil Rule 3(C) because: (i) Lumber Liquidators maintains its executive offices and principal place of business in this division; (ii) one or more of the defendants either resides in or maintains offices in this division; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lumber Liquidators, occurred in this division; and (iv) defendants have received substantial compensation in this division by doing business here and engaging in numerous activities that had an effect in this division.

## III.     THE PARTIES

34.     Lead Plaintiff Amalgamated Bank, as Trustee for the LongView 600 Small Cap Index Fund, is a Lumber Liquidators shareholder and has been continuously since 2009.  Lead Plaintiff is a citizen of the State of New York.

35.     Plaintiff Phuc Doan is, and at all relevant times has been, a holder of Lumber Liquidators common stock.  Plaintiff is a citizen of the State of North Dakota.

---

any other persistent course of conduct, or deriving substantial revenue from services rendered, in this Commonwealth, *id*. §8.01-328.1 A 4.

36.     Plaintiff R. Andre Klein is a current shareholder of Lumber Liquidators and has continuously owned Lumber Liquidators stock since July 2011. Plaintiff is a citizen of the State of New York.

37.     Nominal party Lumber Liquidators is a Delaware corporation with its executive offices located in James City County, Virginia, more particularly at 3000 John Deere Road, Toano, Virginia, 23168. Lumber Liquidators is the largest specialty retailer of hardwood flooring in North America. Lumber Liquidators is a citizen of the Commonwealth of Virginia and the State of Delaware.

38.     Defendant Thomas D. Sullivan, Lumber Liquidators' founder, has been the Company's interim CEO since May 21, 2015 and a director since the Company's inception in 1994. He was Chairman of the Board of Lumber Liquidators from 1994 until May 2015 and is active in the Company's sourcing initiatives. Sullivan previously served as President and CEO of the Company from 1994 to September 2006. Sullivan signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks. Between September 2011 and March 1, 2015, Sullivan sold approximately 1,608,503 shares of his Lumber Liquidators' stock – over 72% of his holdings – for a total insider trading profit of over $60 million. Sullivan is a citizen of the State of Florida.

39.     Defendant Macon F. Brock, Jr. has been a Lumber Liquidators director since November 2007. Brock signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks. Brock is a citizen of the Commonwealth of Virginia.

40.     Defendant Douglas T. Moore has been a Lumber Liquidators director since April 2006. Moore is also a member of the Audit Committee of the Lumber Liquidators Board. Moore signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks. Between September 2011 and March 1, 2015, Moore sold approximately 37,612 shares of his Lumber Liquidators' stock – over

- 12 -

84% of his holdings – for a total insider trading profit of over $2.4 million.  Moore is a citizen of the Commonwealth of Virginia.

41.     Defendant John M. Presley has been a Lumber Liquidators director since April 2006 and was appointed Chairman of the Board in May 2015.  Presley is also the Chair of the Audit Committee of the Lumber Liquidators Board.  Presley signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.  Between September 2011 and March 1, 2015, Presley sold approximately 37,044 shares of his Lumber Liquidators' stock – over 61% of his holdings – for a total insider trading profit of over $3.8 million.  Presley is a citizen of the Commonwealth of Virginia.

42.     Defendant Peter B. Robinson has been a Lumber Liquidators director since April 2010.  Robinson signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.  Robinson is a citizen of the State of Colorado.

43.     Defendant Martin F. Roper has been a Lumber Liquidators director since April 2006.  Roper is also a member of the Audit Committee of the Lumber Liquidators Board.  Roper signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.  Roper is a citizen of the Commonwealth of Massachusetts.

44.     Defendant Jimmie L. Wade has been a Lumber Liquidators director since September 2011.  Wade is also a member of the Audit Committee of the Lumber Liquidators Board.  Wade signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.   Wade is a citizen of the Commonwealth of Virginia.

45.     Defendant Nancy M. Taylor has been a Lumber Liquidators director since April 2014.  Taylor signed the Company's 2014 Form 10-K.  Taylor is a citizen of the Commonwealth of Virginia.

46.     Defendant Daniel E. Terrell has been Lumber Liquidators' CFO since October 2006.  Terrell signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.  Between September 2011

- 13 -

and March 1, 2015, Terrell sold approximately 138,491 shares of his Lumber Liquidators' stock – over 63% of his holdings – for a total insider trading profit of over $8.8 million.  Terrell is a citizen of the Commonwealth of Virginia.

47.     Defendant Carl R. Daniels has been Lumber Liquidators' Senior Vice President, Supply Chain, since October 2011.  Daniels is a citizen of the Commonwealth of Virginia.

48.     Defendant Robert M. Lynch was a Lumber Liquidators director and the Company's President and CEO from January 2012 until May 21, 2015.  Lynch previously served as the Company's President and Chief Operating Officer ("COO") from January 2011 to January 2012. Between September 2011 and March 1, 2015, Lynch sold approximately 227,278 shares of his Lumber Liquidators' stock – over 70% of his holdings – for a total insider trading profit of over $21 million.  Lynch signed the Company's 2011, 2012, 2013 and 2014 Form 10-Ks.  Lynch is a citizen of the State of Texas.

49.     Defendant Jeffrey W. Griffiths served as the Company's CEO from September 2006 to January 1, 2012 and its President from September 2006 to January 2011.  Griffiths is a citizen of the Commonwealth of Pennsylvania.

50.     Defendant William K. Schlegel was the Company's Chief Merchandising Officer from March 2011 until his termination on or about June 19, 2015.  Schlegel is a citizen of the State of South Carolina.

## IV.     THE FIDUCIARY DUTIES OF LUMBER LIQUIDATORS' DIRECTORS AND OFFICERS

51.     As directors and officers of Lumber Liquidators, defendants owed Lumber Liquidators and its shareholders unremitting fiduciary duties of loyalty and good faith, and were and are required to use their utmost ability to control and manage Lumber Liquidators in a fair, just, honest and equitable manner.  Defendants were duty bound to act in furtherance of the best interests

- 14 -

of Lumber Liquidators and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. A claim for breach of loyalty is non-exculpable.

52. Defendants owed Lumber Liquidators a fiduciary duty to conduct the affairs of the Company in a lawful manner and in compliance with state and federal laws and other rules and regulations designed to protect the environment and consumers, including the CARB Regulations and the Lacey Act. This is because compliance with the statutes, laws, rules and regulations applicable to Lumber Liquidators' business and affairs is not optional for the Lumber Liquidators Board.

53. Moreover, as directors and/or officers of a public company, defendants had a fiduciary duty of candor and loyalty pursuant to which they were required to promptly disseminate accurate and truthful information to the SEC and Lumber Liquidators' shareholders regarding the Company's business, prospects and operations. Because of their executive positions and/or access to Lumber Liquidators' internal information, defendants knew or should have known that adverse material facts were being concealed from the investing public, and that such non-disclosure was materially misleading, particularly in light of the false and misleading statements that defendants caused the Company to make. Such concealment and failures to disclose, together with the material misrepresentations and false public statements on the part of defendants, caused Lumber Liquidators common stock to trade at artificially inflated prices.

54. To discharge their fiduciary duties of candor, good faith and loyalty, the directors and officers of Lumber Liquidators were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Lumber Liquidators were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Lumber Liquidators conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions and practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with securities laws; and

(d)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

55.      By reason of their corporate positions and their ability to control the business and corporate affairs of Lumber Liquidators, defendants were required to use their ability to control Lumber Liquidators in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Lumber Liquidators and not in furtherance of their own personal interests or ideology.  In violation of their fiduciary duties of candor, loyalty and good faith, defendants caused Lumber Liquidators to conduct its business in an unsafe, imprudent, dangerous and illegal manner.

56.      Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves, instead of acting in the best interests of the Company, and to remain as directors and officers of a public corporation and to continue to prolong the illusion of Lumber Liquidators' success and to conceal the adverse facts concerning Lumber Liquidators' legal compliance status so that they could protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby.  Such

- 16 -

participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, and approving and/or acquiescing in the illegal conduct complained of herein.

57.     During all times relevant hereto, each of the defendants occupied a position with Lumber Liquidators or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Lumber Liquidators and its operations, finances and financial condition.  Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding Lumber Liquidators' business and finances had not been disclosed to, and were being concealed from, its shareholders and the public.  Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding the Company and to take any and all actions necessary to ensure that the officers and directors of Lumber Liquidators did not act upon such privileged non-public information in a manner which caused the Company to violate the law.

58.     Defendants breached their duties of candor, loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results, legal compliance status, and prospects, as detailed herein, and by failing to prevent defendants from taking such illegal actions. Each of the defendants participated in the issuance and/or review of false and misleading statements, including the preparation of false and misleading press releases, Securities and Exchange Commission ("SEC") filings and reports to Lumber Liquidators' shareholders.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now exposed to millions of dollars in potential liability from lawsuits alleging violations of securities laws, consumer protection and environmental laws, and criminal charges contemplated by the DOJ.

59.     Pursuant to Lumber Liquidators' Code of Business Conduct and Ethics ("CBCE"), the Company expects its directors to "comply with all applicable laws, rules and regulations wherever we do business" and to "adhere to the following principles and responsibilities:"

- Act at all times in accordance with Lumber Liquidators's Code of Business Conduct and Ethics . . . ;

- Act at all times with integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;

*       *       *

- Provide, in Lumber Liquidators's reports filed with the Securities and Exchange Commission and other public communications, disclosure that is full, fair, accurate, complete, objective, timely and understandable;

- Comply with rules and regulations of all U.S. and non-U.S. governmental entities and other . . . regulatory agencies to which Lumber Liquidators is subject . . . ;

- Act in good faith, responsibly, with due care, competence and diligence, and without misrepresenting material facts or circumstances;

*       *       *

- Promote ethical behavior among employees under [their] supervision;

- Accept accountability for adherence to this Code of Ethics and Lumber Liquidators's Code of Business Conduct and Ethics; and

- Achieve responsible use of and control over all assets and resources of Lumber Liquidators entrusted to [them].

The CBCE also states:

If you suspect or know someone is violating any law, rule or regulation . . . you should immediately report that violation to your immediate supervisor or the Legal department.

*       *       *

- You must not use false data or manipulate information in a manner to suggest that our products or services have characteristics or comply with specification when you know that they do not.

*       *       *

- 18 -

Lumber Liquidators is committed to being a positive force in communities in which it and its suppliers operate, and supports addressing environmental . . . and health and safety issues that may arise in connection with its operations.  We believe that implementing high standards for the environment . . . leads to higher-quality products and reduced costs both for us and our customers.  To achieve these objectives, Lumber Liquidators has formalized its expectations regarding supplier environmental . . . and health and safety policies in a "Supplier Code of Conduct with Respect to Environmental and Social Responsibility," which includes a "Supply Chain Environmental and Social Responsibility Policy."

*       *       *

Lumber Liquidators Holdings, Inc. is a publicly traded company . . . .  As a result, we are obligated to make various public disclosures.  Lumber Liquidators is committed to full compliance with all relevant disclosure requirements, and has implemented disclosure controls and procedures to assure that its public disclosures will be timely, compliant and otherwise full, fair, accurate and understandable.  Those who are responsible for preparing the Lumber Liquidators' public disclosures, or who provide information as part of that process, are responsible for ensuring that such disclosures are complete, accurate and comply with those disclosure controls and procedures.

60.     Lumber Liquidators' Corporate Governance Guidelines ("CGG") set forth additional responsibilities of the Company's directors.  Lumber Liquidators' CGG states the following, in relevant part:

I.      Responsibilities of the Board of Directors

. . . The Board of Directors' primary function is . . .oversight – defining and enforcing standards of accountability that enable executive management to execute their responsibilities fully and in the interests of shareholders.  Consistent with that function, the following are the primary responsibilities of the Board of Directors:

*       *       *

- Reviewing the Company's strategic plans and objectives, including the principal risk exposures of the Company and the Subsidiaries;

- Providing advice and counsel to the Chief Executive Officer and other executive management of the Company;

- Assisting management in the oversight of the Company's compliance with applicable laws and regulations, including in connection with its public reporting obligations; [and]

- 19 -

- Overseeing management with a goal of ensuring that the Company's assets are safeguarded through the maintenance of appropriate accounting, financial and other controls;

\*       \*       \*

In discharging their responsibilities, Directors must exercise their business judgment to act in a manner that they believe in good faith is in the best interests of the Company and its shareholders. . . . Directors are also expected to spend the time necessary to discharge their responsibilities appropriately . . . . An alignment of Director interests with those of shareholders is important, and as such Directors are encouraged to own securities of the Company.

61.     Additionally, the members of the Audit Committee, defendants Presley, Moore, Roper and Wade, were required to comply with the obligations set forth in the Charter of the Audit Committee (the "Charter"). According to the Charter, "[t]he purpose of the Committee is to assist the Board in fulfilling its oversight responsibility relating to: . . . (v) the compliance by the Company with legal and regulatory requirements; (vi) the implementation and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; [and] (vii) the evaluation of enterprise risk issues."

## V.     AIDING AND ABETTING AND CONCERTED ACTION

62.     In committing the wrongful acts set forth herein, defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct detailed in this complaint giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

63.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs set forth in this complaint. In taking such actions to substantially assist the commission of the wrongdoing, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

- 20 -

## VI.    FACTUAL ALLEGATIONS

64.    Based in Toano, Virginia, Lumber Liquidators is the largest retailer of hardwood flooring in the United States. Lumber Liquidators offers an extensive assortment of exotic and domestic hardwood species, engineered hardwoods, laminates, bamboo and cork at low prices designed to appeal to a diverse customer base.

65.    Lumber Liquidators has mills in, and buys many of its wood flooring materials directly from mills in, China. In September 2011, Lumber Liquidators acquired the assets of Shanghai-based Sequoia Floorings, Inc. ("Sequoia") related to quality control and assurance, product development, and logistics operations in China. Prior to its acquisition, Sequoia, a trading company, provided sourcing services on approximately 78% of the Company's 2011 merchandise purchases from China.

66.    In connection with the transaction, Lumber Liquidators established a representative office in Shanghai, China and assumed "direct control" of all of its product sourcing in China (through its headquarters in China). As the Company made clear in its 2014 Annual Report filed with the SEC on Form 10- K:

> Sourcing directly from the mill and our unique store model provides the foundation for our value proposition, which we market aggressively to the homeowner, or a contractor on behalf of a homeowner.

### A.    Lumber Liquidators' Violations of Federal Law and Other Rules and Regulations

67.    Due to its status as a U.S. company, Lumber Liquidators is subject to federal and state laws, including the FSCWP Act, CARB Regulations, California's Proposition 65 and the Lacey Act. This action arises out of defendants' conscious failure to cause the Company to comply with the FSCWP Act, CARB Regulations, Proposition 65 and the Lacey Act.

- 21 -

### 1.      Formaldehyde Emissions

68.      According to the EPA, formaldehyde is a "colorless, pungent-smelling gas" that has been shown to cause cancer in humans along with a host of other potential health issues, including eye, nose and throat irritation, wheezing and coughing, fatigue, severe allergic reactions and more. The International Agency for Research on Cancer classified formaldehyde as "carcinogenic to humans" in 2004, based on the increased risk of nasopharyngeal cancer.  Formaldehyde was also designated as a toxic air contaminant in California in 1992 with no safe level of exposure.

69.      Formaldehyde is a component in the production of pressed wood products.  One of the major sources of exposure to formaldehyde is from inhalation of formaldehyde emissions from composite wood products containing urea-formaldehyde ("UF") resins.  Because of that, the federal and state governments impose limits on the amount of formaldehyde that can be present in wood products.

70.      The California Air Resources Board ("CARB") is a department of the California EPA.  CARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy.  CARB oversees all air pollution control efforts in California to attain and maintain health-based air quality standards.  CARB mandates are typically the model for national standards.  For example, the EPA and the Department of Transportation coordinated their most recent round of proposed rules with CARB.  CARB has served as the model for the federal standard in formaldehyde emissions as well.

71.      CARB promulgated the CARB Regulations in January 2009.  The CARB Regulations apply to a range of composite wood products, including flooring, hardwood plywood, particleboard and fiberboard.  The CARB Regulations (Phase 2) dictate that certain wood products sold in the State of California must emit no more than 0.05 ppm of formaldehyde as determined per relevant

- 22 -

testing methods.  Violations of CARB Regulations may result in severe penalties assessed against the offending parties.  CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet the CARB formaldehyde emission standards by having their composite wood products certified through an accredited third-party certifier.  Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

72.    The U.S. statute that governs permissible formaldehyde emissions, the FSCWP Act, was signed into law on July 7, 2010.  The FSCWP Act adopted the standards established by CARB as a nationwide standard.  In May 2013, upon being directed by Congress to promulgate final regulations implementing the FSCWP Act, the EPA published two proposed rules which are very similar to California's CARB Regulations.  *See* 40 C.F.R. Part 770; 78 F.R. 34820, 44089, 51695, and 79 F.R. 19305.  The EPA's proposed rules are slated to take effect later this year.

73.    Many, if not all, of Lumber Liquidators' Chinese flooring products contain UF or other formaldehyde resins.  For example, the Material Safety Data Sheet for Lumber Liquidators' Morning Star Bamboo Flooring states: "This product is composed of bamboo fibers bonded together with urea formaldehyde (UF) resins."  UF makes up 10%-11% of the product.

74.    On June 20, 2013, an article published on *SeekingAlpha.com* alleged, among other things, that testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5 times the maximum legal limit (0.17 ppm as compared to the legal limit of 0.05 ppm imposed by the CARB standards for hardwood plywood) even though the product was labeled as being CARB-compliant.  The article explained that the

investigation into the quality of the Company's wood sourced from China came about as a result of the Company's explanation for how it has been able to continually produce record gross margins.[3]

75.     This disclosure was in direct contrast to Lumber Liquidators' repeated, detailed representations in its SEC filings, on its product labels, website, and elsewhere that its flooring complies with strict formaldehyde standards.

76.     On this news, the price of Lumber Liquidators shares declined, over the course of two trading sessions, $9.40 per share, or nearly 11%, to close at $76.63 per share on June 21, 2013.  This precipitous fall wiped out over $250 million in shareholders' equity.   The Company is also defending numerous lawsuits, including at least one securities class action, consumer action, and environmental protection suit based on violations of California laws.  *See In re Lumber Liquidators Holdings, Inc., Sec. Litig., et al.*, No. 4:13-cv-00157-AWA-DEM (E.D. Va.); *Williamson v. Lumber Liquidators Holdings, Inc.*, No. 1:13-cv-01487-AJT-TCB (E.D. Va.); *Global Community Monitor v. Lumber Liquidators Inc.*, No. RG14733979 (Cal. Super. Ct. Alameda Cnty.).

77.     Defendant Schlegel, the Company's Chief Merchandising Officer, and defendant Lynch, the Company's President and CEO, were directly involved in choosing the suppliers of the Company's wood products, personally visiting mills and manufacturers in China on multiple occasions between 2011 and 2013.  For example, during an analyst conference on September 7, 2011, then-CEO defendant Griffiths stated: "We brought in our President, Rob Lynch and our Senior

---

[3]     The author of the *SeekingAlpha.com* article, Xuhua Zhou, wrote a follow-up article on June 24, 2013, observing that rather than responding to or acknowledging the test results, Lumber Liquidators instead initiated a clearance sale to offload its existing inventory: "Despite having offered to send the company my noncompliant sample and the relevant lab reports, I have yet to correspond with anyone from Lumber Liquidators. Instead, ***Lumber Liquidators initiated an End of Quarter CLEARANCE sale for all its flooring products per a marketing email received this Sunday. The company chose not to follow up on credible questions raised about its product safety and instead launched a marketing sales campaign to get rid of existing inventory faster***. . . .   [I]t is hardly a responsible decision on the part of Lumber Liquidators." *See* http://seekingalpha.com/article/1517322-lumber-liquidators-managements-silence-and-brokers-rebuttal-may-validate-the-worst-fear.

VP of Merchandising, Bill Schlegel.  Both of them have extensive experience in direct sourcing in China and they are actually both there in China today working on some of those initiatives."

78.     On an August 16, 2012 conference call with analysts for the Canaccord Genuity Global Growth Conference, defendant Lynch identified the Company's sourcing as its "key competitive advantage" in its price, selection and quality: "Our sourcing, direct sourcing is a key competitive advantage in our price, selection and quality in our stores. . . .  Quality and availability – because we work directly with the mills, we better control the quality of the product . . . ."

79.     On a July 24, 2013 conference call following the release of the Company's second quarter 2013 results, defendant Lynch discussed the quality and sourcing of the Company's products, stating that "our mills comply with our product specs, because we have personnel on the ground, in the mills. . . .  [W]e don't rely on a distributor to measure and control our quality. . . .  We do stringent testing of our products at multiple levels beyond what's required.  Our products are tested by third-party experts, both at the mill and in off-site labs . . . .  And we also go in and do random tests at the mill."  Emphasizing his and management's knowledge of the Company's sourcing practices, defendant Lynch stated: "I'd like to spend a few minutes today on quality, which is fundamentally important to the success of our premium brands and key to a loyal customer base. Sourcing directly from the mill provides the foundation for our entire value proposition.  Due to our scale, we often purchase the majority of our mill partner's capacity.  And, as a result, we have insight and visibility throughout the sourcing process."

80.     On the same call, with respect to regulatory compliance, Lynch stated:

Our commitment to quality begins with well-designed product specifications, followed by strict adherence to a set of internal standards set well above regulatory requirements.  Because of these standards, the products we sell nationally exceed the most stringent requirements of any state.

We have developed quality control and assurance processes for our products that we believe lead our industry.  Due to our international sourcing, we have more than 60 professionals around the world, including in the U.S., Canada, China and

- 25 -

South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.

        We augment the on-site controls with additional testing in both our own labs and in independent certified facilities.  The combination of our on-site controls and our additional testing is designed to ensure that our [products] exceed the highest regulatory requirements and meet our more stringent internal quality standards.  As national standards are developed around product quality, construction, and packaging, we will engage in and intend to lead our industry in the process.

81.    Indeed, defendant Lynch boasted that he and defendant Schlegel were personally well aware of the workings at the mills in China.  During an August 14, 2013 analyst conference, in response to a question by an analyst requesting additional detail regarding the Company's "sourcing strategies and any advantage you have there," defendant Lynch stated: "[W]e absolutely have a world-class sourcing team.  Our chief merchant, Bill Schlegel, and the team that he has built under him is better than I've ever seen in my career. . . .  In fact, we just did a line review recently in the last couple of weeks in China.  We did an engineer line review.  And some of the feedback we got from the mills were [sic] how impressed they were with how closely we work with them; how we are out in the markets, in their territories, walking their mills with them, interacting with them and building those relationships."

82.    On February 25, 2015, the Company disclosed, during its 2014 fiscal year and fourth quarter earnings call, that *60 Minutes* would "feature our Company in an unfavorable light with regard to our sourcing and product quality, specifically related to laminates.  We believe their story will be a derivative of the Prop 65 matter and *Balero* matter disclosed in our 10-K."  Nonetheless, the Company falsely assured investors that "[e]very media inquiry provides an opportunity for us to reiterate our firm commitment to the safety and quality of our products. . . .  Our rigorous quality control processes include steps designed to ensure compliance with the low-emission standards set by CARB.  Although CARB regulations are only applicable in California, we apply these stringent standards to subject products and we sell everywhere we do business. . . .  As a result of our

- 26 -

continuous commitment to quality, the products you buy at Lumber Liquidators meet CARB standards and are absolutely safe. . . .  We don't just follow the letter of the law, we set the bar even higher so that our customers enjoy the best the safest products in the world."  In response to this information, in part, the Company's stock price fell over 26%, from a close of $68.78 per share on February 24, 2015 to a close of $50.63 per share on February 25, 2015.

83.     On March 1, 2015, the damning *60 Minutes* program aired.  The program explained that Lumber Liquidators' Chinese-manufactured laminate flooring, likely found in "tens of thousands of California households" and nationwide in "hundreds of thousands" of homes, exceeded California formaldehyde standards by ***six to seven-fold***, on average.  In some cases, formaldehyde levels were found to be ***twenty times*** the levels permitted by California law.  The show's guests stated that "it's a level that the U.S. EPA calls polluted indoor conditions."  One of the show's guests, a doctor specializing in environmental pediatrics and exposure to toxic chemicals, stated that "long-term exposure at [the emission] level [measured from Lumber Liquidators' laminate products] would be risky because it would increase the risk for chronic respiratory irritation, change in a person's lung function, [and] increased risk of asthma."  The doctor also stated that "children [would] be the people most likely to show symptoms at that sort of level."  Moreover, "formaldehyde can cause myeloid leukemia and nasopharyngeal cancer at high levels and respiratory issues as well as eye, nose and throat irritation at even low levels."

84.     *60 Minutes* also pointed out that Lumber Liquidators' website "promise[d] that all of their flooring 'meets or exceeds rigorous emissions standards' and they say 'we not only comply with laws, we exceed them.'"  One of the show's guests emphatically stated that these were "not . . . true" statements and that it was "illegal to sell these boxes of wood in California.  We hope that they will not sell these products anywhere in the nation, because they are above the health-based standards the state law has set."

- 27 -

85.     The *60 Minutes* host explained that California regulations have "strict standards for how much of the chemical the core boards in laminate flooring can emit. Every box of laminate flooring Lumber Liquidators sells carries this label – stating it's CARB Phase-2 Compliant – CARB is an acronym for the California Air Resources Board, which sets strict standards for formaldehyde emissions in wood flooring. Congress adopted California's limits when it passed the Formaldehyde Standards Act in 2010." In order to determine if Lumber Liquidators' laminate products purchased outside of California would produce the same emissions results, *60 Minutes* purchased 31 boxes of Chinese-made laminate flooring from Virginia, Florida, Texas, Illinois and New York. The results were as predicted – only one of the samples was compliant with formaldehyde emissions standards. "Some were more than 13x over the California limit. Both labs told [*60 Minutes*] they had never seen formaldehyde levels that high."

86.     One of the show's guests, Tilson, a Wall Street hedge fund manager stated: "In 16 years of professional money management, I've seen hundreds of companies do all sorts of bad things to get their stock prices up. But this has got to be the worst." "Six months after he bet millions the stock would go down, Whitney Tilson got tipped off by someone familiar with Lumber Liquidators' operations in China, who said he was missing the bigger story." "The much bigger story, he said is that Lumber Liquidators was almost certainly purchasing formaldehyde-tainted laminated flooring in China [because] [i]t's cheaper and – it reduces the cost by about 10 percent."

87.     The program then showed footage of an undercover investigator hired by *60 Minutes* to visit three Chinese mills, in the city of Changzhou, which produced laminate flooring for Lumber Liquidators. "Employees at the mills openly admitted that they use core boards with higher levels of formaldehyde to make Lumber Liquidators laminates, saving the company 10-15 percent on the price. At all three mills, they also admitted to falsely labeling the company's laminate flooring as CARB 2, meaning it meets California formaldehyde emissions standards, and the new U.S. federal

- 28 -

law.  At this factory, the general manager told investigators Lumber Liquidators is one of their biggest customers":

> **Manager:** This is a best-seller for Lumber Liquidators.
>
> **Investigator:** For Lumber Liquidators?
>
> **Manager:** Yeah.
>
> **Investigator:** How long have you been selling this?
>
> **Manager:** From last year.
>
> **Investigator:** Is this CARB 2?
>
> \*       \*       \*
>
> **Manager:** No, no, no . . . I have to be honest with you.  It's not CARB 2.
>
> **Investigator:** Can I get CARB 2?
>
> **Manager:** Yes, you can.  It's just the price issue.  We can make CARB 2 but it would be very expensive.

88.     When confronted with this information, defendant Sullivan, Lumber Liquidators' founder and Chairman, stated: "[W]e're never gonna sell something unsafe."  And when pointedly asked whether anybody had "ever reported this to you?"  defendant Sullivan avoided the question, answering that "Again, we will investigate it.  If there is anything going on, we will stop it immediately.  I don't know if it's true or not.  I don't know what the whole story is, but we will investigate it immediately."  When the *60 Minutes* host pointed out to defendant Sullivan: "It certainly calls into question not just these mills, but it calls into question your oversight of these mills,"  defendant     Sullivan     candidly     responded,     "It     could,     yes."     *See* http://www.cbsnews.com/news/lumber-liquidators-linked-to-health-and-safety-violations.

89.     The following day, on March 2, 2015, the Company's stock price fell again, this time over 25%, from a close of $51.86 per share on February 27, 2015, to a close of $38.83 per share on March 2, 2015, wiping out another $352 million in shareholder equity.

- 29 -

90.     On March 4, 2015, U.S. Senator Bill Nelson, (D-FL) called for a federal probe into the practices of Lumber Liquidators. The ranking democrat on the Senate Committee on Commerce, Science and Transportation, sent letters to the Consumer Product Safety Commission ("CPSC"), Centers for Disease Control and Prevention ("CDC"), and the Fair Trade Commission ("FTC").

91.     On March 10, 2015, *The New York Times* reported that New York's Attorney General, Eric T. Schneiderman, had opened an inquiry into whether the Company violated safety standards and that safety officials in California were also likely to investigate.

92.     On March 22, 2015, U.S. Senator Charles E. Schumer (D-NY) called on federal agencies to investigate the safety of Lumber Liquidators' flooring:

> Standing outside a New York City Lumber Liquidators showroom, U.S. Senator Charles E. Schumer today urged the Consumer Product Safety Commission (CPSC) to immediately launch a broad investigation into the safety of Chinese-imported wood flooring material from Lumber Liquidators, and to initiate recalls or other disciplinary action if the product is found to be dangerous. Schumer noted that homes recently rebuilt after Superstorm Sandy could be at risk, and that negative respiratory impacts are more strongly felt in apartments with poor ventilation.

93.     CPSC Chairman Elliot F. Kaye announced on March 25, 2015, that the commission is "actively investigating laminate flooring products from Lumber Liquidators."

94.     Also, on April 15, 2015, defendants were saddled with the attorneys' fees and costs related to GCM's litigation regarding the Company's formaldehyde laced flooring where the Company filed a defamation lawsuit.  Lumber Liquidators' defamation lawsuit which was struck down under California's anti-SLAPP statute which allows the "'early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'"

## 2.     Illegal Timber Harvesting and Import

95.     Originally passed in 1900, the Lacey Act originally made it a federal crime to poach game in one state with the purpose of selling the bounty in another.  The Lacey Act was amended on

May 22, 2008, when the Food, Conservation, and Energy Act of 2008 expanded its protection to a broader range of plants and plant products, including timber (§8204, Prevention of Illegal Logging Practices).

96.    Notably, the 2008 amendments to the Lacey Act made it illegal to import, export, transport, sell, receive, acquire or purchase in interstate or foreign commerce timber taken or traded in violation of the laws of the United States, a U.S. State, or relevant foreign law.  Penalties for Lacey Act violations include civil fines of up to $10,000 per violation, criminal penalties (including additional fines and jail time), and forfeiture.  Penalties vary in severity based on the violator's level of knowledge about the products – penalties are higher for those who knew or should have known through the exercise of due care that they were trading in illegally harvested materials.  The Lacey Act also requires that importers of covered products – in this case, wood or wood products – exercise "due care" in identifying the source of goods.

97.    On September 26, 2013, special agents from the Immigration and Customs Enforcement's Homeland Security Investigations unit, together with the FWS and the DOJ, raided Lumber Liquidators' corporate offices in Toano and Richmond, Virginia.  Prior to this raid, the federal authorities had received an advanced copy of the Environmental Investigation Agency ("EIA") Report entitled "Liquidating the Forests" (the "EIA Report").  According to sources and a search warrant filed in Virginia that pertained to the raids, the federal authorities were looking for evidence the Company had knowingly imported wood harvested from the habitat of the endangered Siberian tiger.[4]

---

[4]    Illegal logging has numerous devastating consequences.  For example, clear cutting, a practice that still accounts for 75% of all logging in Russia, has caused certain areas of permafrost forests in northeastern Russia to become "virtual deserts," and the release of methane from these degraded permafrost zones is a major source of greenhouse gas emissions.

1045443_1

98.     In response to the raid, defendants caused Lumber Liquidators to issue a press release

on September 27, 2013, stating:

> Yesterday, sealed search warrants were executed at the Company's corporate offices
> in Toano and Richmond, Virginia by the Department of Homeland Security's
> Immigration and Customs Enforcement and the U.S. Fish and Wildlife Service. The
> Company takes its sourcing and compliance very seriously, and is cooperating with
> authorities to provide them with requested information.
>
> Lumber Liquidators sources its products directly from approximately 110
> domestic and international mills around the world. As a result of the normal course
> of business, the Company is subject to a range of international and domestic
> regulations. Due to the scale of its international and domestic operations, ***Lumber
> Liquidators has policies and procedures in place for the sourcing, harvesting and
> manufacturing of its products designed to comply with federal and other
> regulations related to the importation of wood flooring products. The Company
> has more than 60 professionals around the world who perform and monitor those
> processes. Quality is a key component of Lumber Liquidators' value proposition,
> and through its commitment to continuous improvement, the Company invests
> significant resources for quality control and assurance***.

99.     On this news, the price of Lumber Liquidators' shares declined $5.83 per share, or

more than 5%, to close at $107.13 per share on September 27, 2013, wiping out another $160 million

in shareholder equity.

100.    On October 9, 2013, *The Wall Street Journal* reported that the EIA, a non-profit

organization that conducts undercover investigations to expose environmental crimes around the

world and seeks to increase government enforcement of laws relating to global trade in wildlife and

environmental products through advocacy and publications, had provided advanced copies of the

detailed EIA Report to federal authorities prior to the government raid. The EIA Report, which EIA

made public on or around October 9, 2013, documented the results of a multi-year undercover

investigation into illegal logging in the RFE, a heavily forested region near Russia's border with

China which provides the habitat for the last 450 Siberian tigers in the world.

101.    According to the EIA Report, a Chinese-owned wood-flooring company called

Suifenhe Xingjia Economic and Trade Company ("Xingjia"), with three factories in northeastern

China and at least 14 sawmills throughout the RFE, was the company of greatest concern with respect to illegal logging operations in the RFE.  Among other things, the EIA Report alleges that Xingjia conducts its illegal logging in the RFE through falsified documents and bribes to local Russian officials.

102.    The EIA Report further alleges that analysis of U.S. import records and other undercover sources indicates that Xingjia's largest customer is Lumber Liquidators.  According to the EIA Report, Lumber Liquidators has done business with Xingjia since at least 2007.  The EIA Report further claims that the head of Lumber Liquidators' sourcing operations, including the Company's U.S. head of sourcing, defendant Schlegel, visited Xingjia's office and sawmills in the RFE several times in 2011 and 2012, including in May of 2012, and that thereafter Lumber Liquidators made Xingjia its chief Chinese supplier of solid oak flooring.  The EIA Report includes photos of what are alleged to be boxes of oak flooring stacked at one of Xingjia's factories bearing one of Lumber Liquidators' proprietary flooring brands, Virginia Mill Works, which Xingjia admitted to EIA contained oak from Russia.

103.    In late 2011, in conversations with EIA undercover investigators posing as potential buyers, the president of Xingjia, Mr. Sun, during their very first meeting, openly revealed that much of Xingjia's operations involved illegally harvested protected wood in Russia and that they also were illegally over-harvesting wood on their own land in China.  According to Sun, he gave a similar tour to a high-level U.S. management team of senior executives from Lumber Liquidators.

104.    Xingjia officials also openly described Xingjia's detailed system for sourcing illegal timber – illegally cutting outside of their concession boundaries, overcutting within those boundaries, and purchasing over 90% of their stock from trading companies throughout the RFE that do not provide the required proof of legal sourcing.  Xingjia officials also openly revealed to EIA

- 33 -

investigators that their illegal operations were maintained through bribery and high-level political connections with both Russian and Chinese officials.

105.   Roger Yu, who manages Xingjia's Dalian facilities and is the brother-in-law of Xingjia President Sun, told EIA investigators that the raw material for these shipments included oak from Russia.  During a second visit to Dalian Xingjia in early 2012, Yu stated that around half of the oak used in flooring for Lumber Liquidators came from Russia.  Lumber Liquidators imported approximately three million square feet of oak flooring from Xingjia between May 2012 and August 2013 when Company executives were visiting the RFE.

106.   Numerous suppliers identified by Xingjia had strong ties to illegal logging.  For example, three employees of one supplier identified by Xingjia, including its head of timber harvesting, were sentenced to prison in 2010 for illegal logging, and more company employees are currently under investigation.  A different supplier is the subject of a sweeping investigation into illegal logging.  These are the two largest cases of illegal logging to be uncovered in Khabarovsk Province in the past three years, and both firms under investigation (Beryozoviy and Investstroy) are Xingjia suppliers.  According to EIA investigators, Xingjia openly acknowledged these companies were sources for their wood.

107.   Xingjia's connection to illegal sourcing would be obvious to anyone doing business with Xingjia.  The EIA Report states that numerous sources throughout the RFE reported to undercover EIA investigators that at least 80% of all trees harvested in the area are done so illegally: "EIA's investigation clearly illustrates that Xingjia's oak supplies are riddled with illegal sources and that it is immediately apparent to anybody who asks them where their wood originates.  U.S. import data and statements from Xingjia officials confirm that Lumber Liquidators is far from 'anybody,' and in fact is their single most prominent customer of oak flooring."

- 34 -

108.    Moreover, according to the EIA Report, the illegal sourcing of Lumber Liquidators'

Chinese flooring products was verified through independent testing:

> During visits to Chinese manufacturers, EIA was given samples of boards and manufactured flooring by six companies exporting to the U.S. and EU. Eleven of these samples were provided by representatives from both the Suifenhe and Dalian facilities of Xingjia, the key supplier to Lumber Liquidators. Five of these eleven samples were cut from a batch of flooring which EIA observed Xingjia workers preparing for shipment to Lumber Liquidators. EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing. Preliminary results from stable isotopic analysis indicated that every sample provided was Russian in origin. For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater. These results indicate that all of the samples received from Xingjia were likely sourced from the forests of Khabarovsk Province – the forests where the company claimed to be sourcing, and where their suppliers have previously been convicted of, and are currently suspected of, illegal logging.

(Footnote omitted.)

109.    Zhejiang Dadongwu Greenhome ("Greenhome"), a flooring company located near

Shanghai, and a primary supplier of hand-scraped solid flooring to Lumber Liquidators in 2011,

reported to EIA investigators that although it regularly imports oak logs from Germany, those logs

are supplied by mills (including Xingjia) that harvest from Russia. Greenhome told EIA

investigators that Lumber Liquidators (who is aware of the true harvesting/sourcing) declared all

shipments from Greenhome were from Germany on the declaration forms required under the Lacey

Act because the "'U.S. market and government don't like [wood from] Russia.'"

110.    These allegations are in direct contrast to Lumber Liquidators' repeated, detailed

representations on its product labels, website, and elsewhere that its lumber sourcing "complies with

U.S. laws and regulations including the Lacey Act."

111.    Nonetheless, Lumber Liquidators continued issuing false statements regarding its

compliance with the Lacey Act and environmental protection laws. On an October 23, 2013

conference call, following the release of the Company's third quarter 2013 results, defendant Lynch

- 35 -

addressed the sealed search warrant issued by federal authorities and denied that the Company

engaged in any illegal sourcing:

> I can assure you of our commitment to uncompromising integrity and ethical business conduct across all areas of Lumber Liquidators' operations.  We expect and require the same of our suppliers.   Working together, we strive to advance responsible forest management.
>
> *     *     *
>
> Once we establish a mill relationship, we monitor and enforce our specifications and practices through more than 60 employees dedicated to quality control and assurance located on the ground in the U.S., Canada, China and South America.
>
> We invest significant time and resources to safeguard quality and enforce produce compliance, and we terminate relationships with suppliers we believe are not adhering to those standards.

112.    On November 21, 2013, well-known hedge fund manager Tilson criticized the

Company for importing illegally sourced timber from Russia in direct violation of U.S. laws.  Tilson

explained that the Company was only able to maintain its unbelievably high margins, and thus

inflate its revenues, as a result of importing illegal timber.  Tilson suggested that Lumber Liquidators

would likely have to immediately clean up its supply chain, potentially increasing the Company's

timber-sourcing costs, and stated:

> I'm skeptical that this is an isolated problem limited to one rogue supplier.  Rather, the combination of a) the evidence in the EIA report, b) the unusually rapid increase in Lumber Liquidators' margins to unprecedented levels immediately after acquiring a Chinese supply chain company [Sequoia], and c) the hugely corrupt business environment in both Russia and China lead me to believe that Lumber Liquidators has a big problem on its hands.  ***Though I can't prove it, the evidence I see, combined with common sense, makes me think it's highly likely that what EIA has uncovered is a pervasive problem across Lumber Liquidators' Chinese supply chain***.

113.    On this news the price of the Company's shares fell over $16.07 per share, or over

13%, to $99.29 per share over two trading sessions.  This resulted in a $440 million reduction in

shareholder equity.

- 36 -

114.    On a February 19, 2014 conference call following the release of the Company's 2013 fourth quarter and full year results, defendant Lynch stated that "[t]he direct sourcing relationships we have with our mills around the world have never been stronger which enables us to offer the highest quality merchandise . . . . [We] have always been and remain committed to uncompromising integrity and ethical business conduct across all areas of the company's operations.  We expect and require the same of our suppliers and work together to advance responsible forest management."

115.    On the same call, in reference to the federal search warrant served in September 2013, defendant Lynch stated:

> In combination with our internal team, we have engaged in third-party resources, including forensic specialists, to review our sourcing in Northern China.
>
>     These review efforts are in addition to our continuing investment in product sourcing processes and practices over the last two years.  I remain confident in these processes and practices, which are designed to elicit adherence to our comprehensive standards for quality and compliance, which we believe exceed industry standards.

116.    On February 25, 2015, in addition to disclosing that the Company expected the *60 Minutes* broadcast to feature them in a negative light, Lumber Liquidators disclosed in its Form 10-K for the fiscal year ending December 31, 2014, that "[i]n recent communications, the DOJ indicated that it is contemplating seeking criminal charges under the Lacey Act. . . .  At this time, the Company does not have enough information to estimate a reasonably possible loss or range of loss that may result from actions by the DOJ as a result of its investigation."

117.    On April 29, 2015, Lumber Liquidators issued its quarterly report on Form 10-Q with the SEC and revealed that the DOJ "indicated that it is seeking criminal charges under the Lacey Act."  The document went on to state that the Company has reserved at least $10 million to account for future losses associated with the DOJ investigation into Lacey Act violations.  It also revealed that the Company now faces more than 100 class actions related to violations of the Lacey Act and

formaldehyde laws and regulations.  These stunning revelations wiped out more than $34 million in shareholder equity.

## VII.    DEFENDANTS' BREACH OF LOYALTY (AND CANDOR AND GOOD FAITH)

118.    As directors and/or officers of Lumber Liquidators, defendants owed Lumber Liquidators a fiduciary duty to implement and maintain internal controls and policies to ensure compliance with the CARB Regulations and the Lacey Act, among other environmental and consumer protection rules and regulations.  Defendants were fully aware that Lumber Liquidators' international business operations triggered compliance obligations under these rules and regulations. This is because compliance with the statutes, laws, rules and regulations applicable to Lumber Liquidators' business and affairs was not optional for the Lumber Liquidators' Board.  Instead, they were duty-bound to implement and maintain internal controls and policies necessary for Lumber Liquidators to discharge its legal obligations under state and federal law.  In fact, defendants (except Taylors, Daniels, Griffiths and Schlegel) each signed the Company's 2011 Form 10-K, filed with the SEC on February 22, 2012, acknowledging these obligations and representing that the Company was in compliance with them:

> Our operations and properties are also subject to federal, provincial, state and local laws and regulations relating to the use, storage, handling, generation, transportation, treatment, emission, release, discharge and disposal of hazardous materials, substances and wastes . . . .  We do not incur significant costs complying with environmental laws and regulations. . . .

> Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment.  We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws.  We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

> Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued

- 38 -

and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. ***In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.***

> ***We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources***, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition and results of operations.

The Company's 2012, 2013 and 2014 Form 10-Ks, filed with the SEC on February 20, 2013, February 19, 2014, and February 25, 2015, respectively, and signed by the same defendants, contained substantially identical language.[5]

119. Moreover, defendants were fully aware of the risks of importing wood from China – a country often associated with the export of wood products with excess formaldehyde levels and illegally sourced timber. For example, in February 2012, the leading Chinese hardwood flooring company, Anxin Weiguang Flooring, was forced to pull its wood flooring products from shelves pending an investigation by Shanghai's Bureau of Supervision, Inspection and Quarantine because of claims that the flooring emitted excessive levels of formaldehyde. One study, entitled "Formaldehyde in China: Production, consumption, exposure levels, and health effects," 35 Environment Int'l (Nov. 2009), found that over the last 20 years, China's formaldehyde industry has experienced unprecedented growth, and now produces and consumes one-third of the world's formaldehyde. More than 65% of the Chinese formaldehyde output is used to produce resins which are mainly found in wood products. These are also the major source of indoor air pollution in China. The study documented numerous instances of hazardous occupational exposure to formaldehyde in Chinese wood workers.

---

[5]    Defendant Taylor signed the 2014 Form 10-K filed with the SEC on February 25, 2015.

120.   Despite this knowledge, defendants did not proactively manage Lumber Liquidators' risk and/or compliance associated with regulations related to its importation, manufacture, sale and distribution of Chinese flooring.  In fact, defendants admitted as much in Lumber Liquidators' 2012 Annual Report filed with the SEC on Form 10-K on February 20, 2013, when they caused the Company to report that its "experience with the legal and regulatory practices and requirements in China is limited."  As a result of defendants' failure to stop these illegal practices, Lumber Liquidators has been severely injured by the violations of CARB Regulations, the Lacey Act, and other rules and regulations.

121.   Corporate directors may be held personally liable to the corporation for damages arising from their failure to timely act when faced with a known duty to act, such as the corporation's obligation to comply with the statutes, laws, rules and regulations applicable to its business and affairs.  The duty to cause the Company to comply with CARB Regulations, the Lacey Act, and other environment and consumer protection rules and regulations fell squarely upon Lumber Liquidators' Board; yet they consciously failed to act.  Accordingly, defendants breached their duty of loyalty to Lumber Liquidators and are liable for the resulting damages.

## A.   Defendants' False and Misleading Statements and Omissions

122.   During the course of defendants' scheme to generate revenue at the expense of complying with federal and state law, defendants issued several reports to Lumber Liquidators' shareholders in which they trumpeted the quality of the Company's timber and the Company's sourcing practices.  These reports, signed by defendants as indicated herein, ¶¶38-48, 123-126, were false and misleading when issued because defendants failed to disclose that Lumber Liquidators was selling illegally sourced and toxic products to its customers, which constituted an additional breach of the fiduciary duties they each owed to the Company.

- 40 -

123. For example, on February 22, 2012, defendants caused Lumber Liquidators to file with the SEC its 2011 Form 10-K for the year ended December 31, 2011. The Form 10-K, signed by defendants Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Terrell, stated:

Our value proposition to the customer is a key driver of our business. Important components include:

• **_Price_**. A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices. We are able to maintain these prices across our product range because we generally purchase flooring directly from mills.

\* \* \*

• **_Quality_**. We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers. We work directly with our supplier mills to source and produce flooring that will meet our high quality standards.

\* \* \*

We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. As part of ensuring the high-quality nature of our brands, we have developed demanding product standards. . . . We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications.

We currently purchase products from approximately 120 domestic and international vendors, which are primarily mills or trading companies. Trading companies contract with mills, located primarily in China, to produce quality products to our specifications, work on our behalf to control quality at the mill locations and handle certain other matters. In 2011, one of the trading companies, Sequoia Floorings Inc. ("Sequoia"), provided services on approximately one-third of our merchandise purchases, primarily in Asia. In September 2011, we entered into an agreement to acquire certain assets of Sequoia relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. Our top 10 suppliers, including Sequoia, accounted for approximately 70% of our supply purchases in 2011. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. . . . In 2011, approximately 42% of our product was sourced from Asia, 50% from North America, 7% from South America and 1% from other locations, including Europe and Australia.

- 41 -

124.    Similarly, on February 20, 2013, defendants caused Lumber Liquidators to file with the SEC its 2012 Form 10-K for the year ended December 31, 2012.  The Form 10-K, signed by defendants Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Terrell, stated:

### Sourcing Direct from the Mill

*Our Suppliers.*  We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors.  We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products.  We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands.  We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. . . .

. . . In 2012, approximately 43% of our product was sourced from Asia, 50% from North America, 6% from South America and 1% from other locations, including Europe and Australia. . . .

*Sourcing Initiatives.*  In 2011, we began a process to continually challenge, and ultimately strengthen, the structure of our sourcing relationships with the best international and domestic mills.  Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment . . . .  These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:

*        *        *

•    Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

•    Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

125.    On February 19, 2014, defendants caused Lumber Liquidators to file with the SEC its 2013 Form 10-K for the year ended December 31, 2013.  The Form 10-K, signed by defendants Lynch, Terrell, Sullivan, Brock, Moore, Presley, Robinson, Roper and Wade, falsely stated:

We invest significant resources to design and produce products of the highest quality . . . .  Proprietary brands, supported by [our direct] relationships [with mills], allow us greater control over product design and production, which we monitor

through an expansive network of experienced quality control and assurance professionals positioned both at the mill and at our distribution facilities.

*       *       *

We believe sourcing directly from mills enables us to offer a broad assortment of high-quality . . . products . . . at a consistently lower cost than our competitors. We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. . . . *We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at the mills, coordinating inspection and assurance procedures. . . . We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.*

*       *       *

*We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. The scale of our purchasing and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers not adhering to our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product.*

*       *       *

We seek the highest quality at the best value, in consideration of where the raw material grows.

126.    On February 25, 2015, defendants caused Lumber Liquidators to file with the SEC its

2014 Form 10-K for the year ended December 31, 2014.  The Form 10-K, signed by defendants

Lynch, Terrell, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Taylor, falsely stated:

We invest significant resources to design and produce products of the highest quality . . . .  Proprietary brands . . . allow us greater control over product design and production, which we monitor through an expansive network of experienced quality control and assurance professionals.

*       *       *

We believe sourcing directly from mills enables us to offer a broad assortment of high-quality . . . products . . . at a consistently lower cost than our competitors. We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. . . . *We are able to set demanding specifications for product*

- 43 -

> *quality and our own quality control and assurance teams are on-site at certain mills, coordinating inspection and assurance procedures. . . .*
>
> *We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.*
>
> *      *      *
>
> *We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. . . . [T]he scale of our purchasing and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers not adhering to our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product. . . . .*
>
> *      *      *

We seek the highest quality at the best value, in consideration of where the raw material grows . . . .

127.   At least as early as April 6, 2012, the Company's website represented, under the heading "Eco-friendly Flooring," that "Our flooring comes from managed forests," stating:

> Lumber Liquidators offers flooring brands that practice responsible harvesting. . . . Tree cutting is monitored very carefully within a selective cutting and replanting strategy. . . .
>
> . . . Flooring mills must submit harvesting plans to the local government for approval. As part of this process, they map and grid the land affected and take an inventory of the trees (size and species) in each grid. The government will then approve the plan and the mills must cut to it. There are limitations on the number and size of each species that can be harvested from each grid and then they must move to the next grid. Once a grid is harvested, they cannot go back there until 30 years has passed.[6]

128.   At least as early as November 11, 2012, the Company's website represented that the Company ensures that every supplier complies with the Company's "Supplier Code of Conduct with Respect to Environmental and Social Responsibility":

> Since 2007, each of our suppliers has been required to comply with our supplier code of conduct. . . .

---

[6]   *See*   http://web.archive.org/web/20130716135521/http://www.lumberliquidators.com/ll/flooring/ECOfriendly.

- 44 -

Over the years, we have worked directly with a select group of vendors and mills with whom we have cultivated long-standing relationships.  We often pay announced and unannounced visits to our suppliers' mills and forests and assess their adherence to our code of conduct and its protocols . . . .  In many cases, we visit potential suppliers to assess their ability to comply with our environmental and social policies prior to ordering products from them. . . .

In the event we learn that any employee or supplier has engaged in behavior that has violated our policies, we would take appropriate remedial action.[7]

129.    The Company's marketing materials, including the Company's website, specifically represent to consumers that the Company's Chinese flooring products comply with the formaldehyde emission regulations propounded by CARB and, indeed, comply with even stricter European Union formaldehyde standards:

All laminates and engineered flooring products sold by Lumber Liquidators are purchased from mills whose production method has been certified by a Third Party Certifier approved by the State of California to meet the CARB standards. . . .

Though it currently applies only to products sold in California, Lumber Liquidators made a decision to require all of our suppliers to comply with CARB regardless of whether we intended to sell the products in California or any other state/country.  In addition, our suppliers manufacture their products in accordance with the European standard which has stricter guidelines than the California [sic].

In addition to the CARB requirements, Lumber Liquidators regularly selects one or more products from each of its suppliers and submits them for independent third-party lab testing.  This is done as a monitoring activity to validate ongoing compliance.[8]

130.    Specifically, defendants made false and misleading statements and/or failed to disclose that:

(a)    the Company imported flooring products sourced from illegally logged wood in the RFE in violation of the Lacey Act;

---

[7]    *See*   http://web.archive.org/web/20131020150207/http://www.lumberliquidators.com/assets/ images/product_page/California_Supply_Chains_Act.pdf.

[8]    *See*    http://t.lumberliquidators.com/view_question!PAGETYPE?sf=101133&documentid= 415037&action=view.

(b)      the Company's products failed to comply with applicable laws and regulations governing formaldehyde emissions from composite wood products under the CARB standards;

(c)      the Company misrepresented the country of harvest on custom forms, failing to indicate that the wood in the products had been harvested from the RFE, in violation of the Lacey Act;

(d)      the Company had inadequate internal controls for ensuring compliance with the Lacey Act and the CARB standards;

(e)      the decrease in the Company's cost of product and increase in margins were achieved as a result of violations of the Lacey Act and the CARB standards;

(f)      a substantial portion of the Company's earnings and revenues were thereby earned as a result of the violation of these laws;

(g)      the Company's gross margin expansion was not sustainable, and the Company faced the risk of large fines, penalties, forfeitures, judgments and/or settlements in connection with government regulatory actions and/or consumer class actions related to its practices; and

(h)      as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**B.      Defendants Caused the Company to Repurchase Stock at Artificially Inflated Prices**

131.    As described herein, defendants' hid from shareholders the true origin and safety of its wood flooring products, which caused Lumber Liquidators' stock price to trade at artificially inflated prices.  Despite knowing that the Company's stock price was artificially inflated, defendants authorized the repurchase of up to $150 million in Company stock.

132.    The Company announced a series of stock repurchases starting on February 22, 2012, and again on November 15, 2012 and February 19, 2014, for up to $50 million each.  Defendants ultimately caused the Company to repurchase 2,723,607 shares for $135,272,000.

- 46 -

133.     The following table represents the Company's stock repurchase activity through the quarter ending December 31, 2014:

| Year Ended December 31, | 2014 | 2013 | 2012 |
|---|---|---|---|
| Shares Repurchased | 671,200 | 403,630 | 1,648,777 |
| Average Price per Share | $77.68 | $84.40 | $29.74 |
| Total Aggregate Costs | $52,138,000 | $34,066,000 | $49,068,000 |

134.     By causing the Company to repurchase stock when they knew the true state of Lumber Liquidators' business and financial prospects, defendants purchased the Company's stock at artificially inflated prices.  Once the true facts emerged, the Company's stock plunged, trading at $30.78 per share as of March 31, 2015 – wiping out over $1.2 billion in shareholder equity.  On September 28, 2011, the day prior to Company's announcement that it would purchase Sequoia, Lumber Liquidators' stock traded at $15.54 per share.  Thus, by repurchasing the stock at $29.74, $84.40 and $77.68 per share, defendants caused the Company to repurchase its stock at significantly inflated prices.

135.     Defendants' decision was not a valid exercise of business judgment because defendants knew the true state of Lumber Liquidators' business and financial condition when they authorized the stock repurchases.  Moreover, defendants knew that the Company's future growth and profits were not sustainable because the massive increase in Lumber Liquidators' margins was due to the use of illegally harvested wood and manufacturing processes that did not comply with state and federal environmental laws and regulations.  The repurchases falsely signaled to the Company's shareholders and the public that the purchase of the Company's stock at those prices was the best use of the Company's cash and that purchases of the stock at the market price prevailing at that time represented a good value for the Company.

136.     Thus, defendants breached their fiduciary duties by causing the Company to purchase its own shares at artificially inflated prices.

- 47 -

C.     **The Individual Defendants' Unjust Compensation**

137.   During the relevant period, the officer defendants were motivated to keep Lumber Liquidators' stock price artificially inflated in order to line their own pockets.  The Company had a program that specifically incentivized the officer defendants to attain and sustain certain financial metrics such as operating income and earnings per share ("EPS") and rewarded them handsomely for meeting those goals.

138.   During the relevant period, despite having direct responsibility for decisions concerning the Company's sourcing of wood from China, defendants Terrell, Daniels, Lynch, Sullivan, and Schlegel were awarded the maximum amount of incentive-based compensation in 2013 by the Compensation Committee, which included defendants Roper, Brock, and Robinson.  This compensation was unjust because the Company's profit margins were only achieved by the unlawful sourcing of wood from China and other places.

139.   Moreover, egregiously, the Compensation Committee actually increased the maximum incentive-based compensation for defendants Terrell, Daniels, Lynch, and Schlegel in 2013 to allow them to fully capitalize on the Company's unlawfully inflated profits.  As disclosed in the Company's Proxy Statement:

> The Compensation Committee identified an opportunity to modify the approach to cash bonuses because the annual cash bonus had historically limited the upside potential to reward outstanding performance and appeared uncompetitive in the marketplace.  Accordingly, with the exception of Mr. Sullivan, ***we increased the maximum potential annual cash bonus awards that our executives could achieve in 2013 from 120% of their bonus target to 200% of their bonus target*** in order to incent and reward exceptional results.

140.   After they raised the ceiling on the maximum permissible payout to defendants Terrell, Daniels, Lynch, and Schlegel, the Compensation Committee awarded the full 200% bonus to all such defendants.

141.   For 2013 incentive-based compensation:

- 48 -

the Compensation Committee determined that operating income represented the most comprehensive financial measure in evaluating executive performance. A scale was established which set percentages of the Target Bonuses that would be paid out depending on the Company's actual operating income for the year. The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the Compensation Committee's views on the appropriate levels of total compensation. The applicable scale for 2013 is set forth below:

<u>Triggers for 2013 Incentive-Based Compensation</u>

| Actual 2013 Operating Income | Percentage of Target Bonus |
|---|---|
| Below $78,346,010 | Zero |
| $78,346,010 – $82,263,310 | 25% |
| $82,263,311 – $86,180,610 | 50% |
| $86,180,611 – $90,097,126 | 75% |
| $90,097,127 – $93,231,751 | 100% |
| $93,231,752 – $96,365,591 | 125% |
| $96,365,592 – $99,499,432 | 150% |
| $99,499,433 – $101,852,763 | 175% |
| Above $101,852,763 | 200% |

In 2013, our actual operating income was $126,022,580. Accordingly, Bonus Plan participants were awarded 200% of their respective Target Bonuses. Specifically, the following sets forth the Target Bonus for our named executive officers and the amounts awarded and paid to each under the Bonus Plan for 2013:

| Executive | 2013 Base Salary[1] ($) | Target Bonus Percentage | Target Bonus Amount ($) | Percentage of Target Bonus Awarded for 2013 | Bonus Amount Awarded for 2013[2] ($) |
|---|---|---|---|---|---|
| Mr. Lynch | 675,000 | 100% | 675,000 | 200% | 1,350,000 |
| Mr. Terrell | 341,649 | 60% | 204,989 | 200% | 409,979 |
| Mr. Schlegel | 368,842 | 60% | 221,305 | 200% | 442,610 |
| Mr. Daniels | 302,328 | 60% | 181,397 | 200% | 362,794 |

142.     For 2012, the Compensation Committee had similarly raised the maximum amount of

potential incentive-based compensation for defendants Lynch, Terrell, Daniels, and Schlegel from

- 49 -

120% to 200% of base salary: "Additionally, with the exception of Mr. Sullivan, we increased the maximum potential annual cash bonus awards that our executives may achieve in 2013 from 120% of their bonus target to 200% of their bonus target in order to incent and reward outstanding performance."

143.    The Compensation Committee approved the following incentive-based compensation for 2012:

| Executive | 2012 Base Salary(1)($) | Target Bonus Percentage | Target Bonus Amount($) | Percentage of Target Bonus Awarded for 2012 | Bonus Amount Awarded for 2012(2)($) |
|---|---|---|---|---|---|
| Mr. Lynch | 575,000 | 100% | 575,000 | 113.8% | 654,063 |
| Mr. Terrell | 294,525 | 60% | 176,715 | 112.5% | 198,804 |
| Mr. Sullivan | 330,939 | 100% | 330,939 | 113.7% | 376,443 |
| Mr. Schlegel | 316,250 | 50% | 158,125 | 113.5% | 179,472 |

144.    The 2012 payouts were based on criteria which included EPS goals for the Company. Because the Company exceeded the maximum target EPS established by the Compensation Committee, defendants Lynch, Terrell, Sullivan, and Schlegel earned the full 120% for the "corporate performance" aspect of the compensation matrix:

> For the corporate performance goal in 2012, the Compensation Committee determined that diluted earnings per share ("EPS"), exclusive of non-recurring items, represented the most comprehensive financial measure in evaluating executive performance. A scale was established which set percentages of the corporate performance component that would be paid out depending on our actual EPS for the year. The scale was designed to provide incentive bonuses for superior achievement, while being consistent with the Compensation Committee's views on the appropriate levels of total compensation. The applicable scale for 2012 is set forth below:

| Actual 2012 EPS | Corporate Performance Award Percentage |
|---|---|
| Below $1.00 | Zero |
| $1.10 – $1.02 | 25% |
| $1.03 – $1.07 | 50% |
| $1.08 – $1.14 | 75% |
| $1.15 – $1.25 | 100% |
| $1.26 – $1.37 | 110% |
| Above $1.37 | 120% |

This compensation, however, was unjust and unearned because the Company's successful financial results were based on false and misleading statements.

## VIII.   DAMAGE TO LUMBER LIQUIDATORS

145.   Lumber Liquidators has been, and will continue to be, severely damaged and injured by defendants' misconduct.  Further, as a direct and proximate result of defendants' breach of their duties of loyalty, candor and good faith, Lumber Liquidators has expended and will continue to expend significant sums of money.  These expenditures include, but are not limited to: (i) costs incurred from the investigations into the formaldehyde emission concentrations and sourcing of the Company's Chinese flooring products that resulted in violations of applicable standards and laws; (ii) costs incurred from the compensation and benefits paid to the defendants who breached their fiduciary duties to the Company; (iii) the fines, penalties and disgorgement resulting from the Company's violations of environmental and consumer protection standards; (iv) costs of defending against at least one securities class action lawsuit alleging violations of the federal securities laws, two other actions alleging violations of the Racketeer Influenced & Corrupt Organizations Act and other consumer protection statutes, and countless products liability and other lawsuits; (v) the cost of implementing controls sufficient to ensure compliance with applicable environmental and consumer protection standards, rules and regulations going forward; and (vi) the cost of responding to the inquiries of state attorneys general and other safety officials, including that of New York Attorney General Eric T. Schneiderman.

146.   In addition, Lumber Liquidators' business, goodwill and reputation with its customers, business partners, regulators and shareholders have been gravely impaired.  Moreover, these actions have irreparably damaged Lumber Liquidators' "environmentally conscientious" corporate image.  For at least the foreseeable future, Lumber Liquidators will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated

- 51 -

in improper behavior and have misled the investing public, such that Lumber Liquidators' ability to raise equity capital or debt on favorable terms in the future is now impaired.

147.     Nevertheless, the Lumber Liquidators Board has taken no action against the directors and officers responsible for the damage and injury to the Company, including themselves.  By this action, plaintiff seeks redress for and vindication of Lumber Liquidators' rights against its wayward fiduciaries.

## IX.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

148.     Plaintiffs incorporate by reference and re-allege as if set forth in full the allegations of ¶¶1- 147

149.     Pursuant to Rule 23.1 of the Federal Rules of Civil Procedures, plaintiffs bring this action for the benefit of Lumber Liquidators to redress injuries suffered, and to be suffered, by Lumber Liquidators as a result of the defendants' breaches of fiduciary duty, corporate waste, unjust enrichment and conspiracy.  Lumber Liquidators is named as a nominal party in this action solely in a derivative capacity.

150.     Plaintiffs are now, and have been at all times relevant to this action, shareholders of Lumber Liquidators, and will adequately and fairly represent the interests of Lumber Liquidators in enforcing and prosecuting its rights.

151.     At the time this action was first commenced the Lumber Liquidators' Board consisted of the following nine defendants:  Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade.

152.     Based upon the facts set forth throughout this complaint, applicable law and the longstanding rule that equity does not compel a useless act, a pre-filing demand upon the Lumber Liquidators Board to institute this action against the officers and members of the Lumber Liquidators Board is excused as futile for the reasons that follow.

A.     **Demand Is Excused Because the Conduct of Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade Was Not a Valid Exercise of Business Judgment**

153.    Defendants Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade's challenged misconduct at the heart of this case constitutes an ongoing and continuous scheme to break the law.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented and condoned a business strategy based on deliberate and widespread illegal activities lasting several years.  As the Company admits in its public filings, it generates revenue solely by selling hardwood flooring.  Because hardwood flooring is the Company's primary source of revenue, the members of the Board have a duty to understand how the Company's revenue is created and that it complies with applicable laws, rules, and regulations. Moreover, as explained herein, defendants knew or consciously disregarded that their sourcing practices violated applicable federal and state laws, including the Lacey Act, CARB Regulations and other environmental and consumer protection rules and regulations.  It is not a valid exercise of business judgment and, thus, a breach of fiduciary duty to cause a company to seek profit by violating the law.

154.    Despite the fact that Lumber Liquidators imports nearly 50% of its products from Asia (with China – a country notorious for its lumber black market – being by far Asia's largest exporter of timber), the Company maintains a representative office in Shanghai with "direct control" over its product sourcing in China, and the Company claims that it negotiates directly with the lumber mills to eliminate the middleman, is "environmentally conscientious," and "only purchases from suppliers who practice sustainable harvesting," on defendants' watch a long-standing scheme to violate environmental standards and laws occurred.

155.    Defendants also each ignored the repeated warnings derived from the Company's own internal controls – demonstrating that the wood the Company was buying directly from mills in

- 53 -

China was not CARB Phase-2 compliant.  First, the market price for CARB Phase-2 compliant wood was significantly higher than the price Lumber Liquidators was paying.  The price disparity was made apparent to defendants when, suddenly, the Companies' margins on its hardwood products grew much higher than the margins of its main competitors, Home Depot and Lowe's.  The director defendants cannot profess ignorance that the wood the Company was buying from China was not CARB Phase-2 compliant in light of the artificially low prices the Company paid and high margins received for such wood.

156.    More specifically, defendants consciously or recklessly ignored the Company's highly unusual profit margins compared to Lowe's and Home Depot.  The Company's profit margins were almost identical to its largest competitors from 2007 through 2011.  But from 2012 through 2014, the Company's profit margins increased and significantly exceeded those of Home Depot and Lowe's.  There was no rational explanation for this due to the fact that the Company sells a commodity.  Defendants caused the Company to issue multiple false and misleading statements during the relevant period improperly attributing the increased margins to the Company's "sourcing initiatives."  However, as indicated herein, this explanation was false and made no economic or rational sense because the Company's competitors (Home Depot and Lowe's) were larger and had a lower cost structure than Lumber Liquidators.  This was known intimately by defendants because, again, hardwood flooring is not only the Company's core product; it is the Company's ***only product***.[9]  The director defendants knew the Company's alleged sourcing initiatives could not reduce costs to such an extent as to permit Lumber Liquidators to suddenly and substantially increase its profit margins far in excess of those of Home Depot and Lowe's.  Because they consciously or

---

[9]    Thus, the Lumber Liquidators' directors are also charged with knowledge of key facts concerning the Company's hardwood flooring under the "core product" doctrine.

recklessly ignored this obvious fact, the director defendants acted in bad faith and are not entitled to the protection of the business judgment rule.

157.    Indeed, as the *60 Minutes* exposé revealed, all one had to do to discover the fact that the wood was not CARB Phase-2 compliant was go to the mills in China.  The workers there readily admitted that the wood was not CARB Phase-2 compliant and that they just slapped a CARB Phase-2 compliant sticker on the wood.  Moreover, the director defendants repeatedly caused Lumber Liquidators to represent in SEC filings during the relevant period that the Company sent its own quality control employees to China to inspect the wood being bought directly by Lumber Liquidators from the mills.  As late as November 2014, Lumber Liquidators heavily emphasized this fact in presentations to investors, bragging:  "[Our] [p]roducts are the BEST in their categories, led by our flagship Bellawood; [s]ignificant investment in quality control and assurance around the world, including 60 professionals in the U.S., China and South America monitoring daily, most often at the mill[.]"  Such employees would have discovered the same thing the *60 Minutes* crew discovered, especially because the Company's employees regularly visited the mills, not just on one or two occasions.  Since the Company's internal controls were designed to move such information up to defendants, each defendant became aware of these violations.

158.    As demonstrated herein, the entire Board knew or recklessly disregarded the fact that Lumber Liquidators was buying wood from China and Russia that was unlawfully sourced and which had unlawfully high levels of formaldehyde.  In fact, each of the Company's then directors signed the 2014 Annual Report in which they caused the Company to tout its control over sourcing:

> Sourcing directly from the mill and our unique store model provides the foundation for our value proposition, which we market aggressively to the homeowner, or contractor on behalf of the homeowner.

159.    Moreover, as noted *supra*, defendant Lynch, Lumber Liquidators' former CEO, president and director, was heavily and directly involved in the Company's sourcing initiatives and,

as a result, regularly traveled to China during the relevant period and visited the mills.  He thus had direct knowledge of the fact that the wood Lumber Liquidators was buying was not CARB Phase-2 compliant and/or was illegally sourced.  He made regular reports to the entire Board about the Company's sourcing initiatives and thus, upon information and belief, advised the Board of the results of his observations from China.

160.    Defendant Schlegel, the Company's Chief Merchandising Officer at the time, also regularly visited the Chinese mills and was instrumental in choosing the Company's suppliers.  He visited the mills and manufacturers numerous times between 2011 and 2013.  Defendant Schlegel made regular presentations to the entire Board about the Company's sourcing initiatives and, thus, upon information and belief, advised the Board of the results of his observations in China.

161.    Moreover, defendants consciously disregarded the fact that their core product was in violation of the law when they chose to continue selling it after the Company's corporate headquarters was raided by government agents executing search warrants on September 26, 2013.  It was not until May 7, 2015, nearly two years later that the Company announced it was suspending the sale of laminate flooring imported from China.  Worse yet, defendants waited two months after the *60 Minutes* exposé to stop selling the tainted flooring.

162.    Similarly, during the relevant period, several public reports and articles alleged that Lumber Liquidators was unlawfully sourcing hardwood from China and the Russian Far East.  Upon information and belief, those articles and reports, as well as complaints to CARB regarding the significantly excessive amounts of formaldehyde in the wood, were brought to the attention of Lumber Liquidators' Board, thus giving the directors actual knowledge of the wrongdoing.

163.    As a result, the Lumber Liquidators Board Members' conscious decision to implement or condone a business strategy based on widespread illegal activities was not a valid

exercise of business judgment and breached their fiduciary duties of loyalty. Accordingly, pre-suit demand on the Lumber Liquidators Board is excused as futile.

## B. Demand Is Excused Because Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Taylor and Wade Each Face a Substantial Likelihood of Liability Resulting from Their Misconduct

164. A pre-suit demand upon the Lumber Liquidators Board is excused because each of the Lumber Liquidators Board Members is personally interested in the outcome of this litigation, having caused Lumber Liquidators to issue false and misleading statements to the investing public in breach of their fiduciary duties of loyalty, candor and good faith. In particular, Lumber Liquidators' 2011, 2012, 2013 and 2014 Annual Reports on SEC Form 10-K were false and misleading when issued because they did not disclose that the Company was selling illegally sourced and toxic products to its customers. Consequently, each director defendant faces a substantial likelihood of liability and is interested in the outcome of this action.

165. The director defendants were responsible for reviewing and approving the Company's financial statements. By authorizing the false financial statements and public statements alleged herein which were made beginning in 2012, by signing the annual reports on Form 10-Ks filed with the SEC during the relevant period, and by failing to correct other statements which the Company Officers and Executives made during such time, the director defendants were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to lawsuits claiming violations of the federal securities laws and an investigation by the DOJ and other government agencies and entities.

166. Moreover, the current director and executive defendants failed to disclose the departure of Ray Cotton, the Company's Chief Compliance and Sustainability Officer in May 2015. Despite the whirlwind of problems relating to the Company's failure to comply with federal and state laws, rules and regulations regarding formaldehyde and environmental practices, defendants

only revealed Cotton's departure when they were exposed by hedge fund investor Tilson. These defendants' attempt to hide the departure of the executive in charge of compliance and sustainability violates defendants' fiduciary duty of candor and subjects each of them to a substantial likelihood of liability.

167.    The director defendants also face a substantial likelihood of liability for causing Lumber Liquidators to engage in illegal and unlawful conduct. The DOJ and other federal agencies are investigating the Company for violations of federal law. Here, hardwood flooring accounted for 100% of Lumber Liquidators' revenues during the relevant period and was the Company's core (and indeed, sole) product. The director defendants were specifically responsible for ensuring Lumber Liquidators had adequate internal controls regarding the Company's compliance with federal and state rules and regulations regarding its hardwood flooring. In fact, they repeatedly stated how robust those purported controls were. Thus, director defendants are directly responsible for Lumber Liquidators' failure to stop the illegal use of the Chinese flooring products, and for the substantial damages Lumber Liquidators is subject to in the ongoing lawsuits and investigations. Defendants' knowing or reckless breach of fiduciary duty constitutes bad faith conduct under Delaware law and, therefore, each defendant faces a substantial likelihood of personal liability. Thus, demand is excused as to all director defendants.

### C.    Defendants Presley, Moore, Roper and Wade Face a Substantial Likelihood of Liability as Audit Committee Members

168.    Defendants Presley, Moore, Roper and Wade are the current members of Lumber Liquidators' Audit Committee, and were also members of the Audit Committee throughout the relevant period. As Audit Committee members, they were responsible for "assist[ing] the Board in fulfilling its oversight responsibility relating to . . . : (v) the compliance by the Company with legal and regulatory requirements; (vi) the implementation and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; [and] (vii) the evaluation of

enterprise risk."  Despite these duties, these defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance.

169.    The Audit Committee Charter requires its members to meet with and get direct reports from the Company's senior management, including those individuals directly responsible for buying wood from the mills in China.  Specifically, in 2013, Lumber Liquidators' Board met five times; the Audit Committee met six times and took additional actions by uniform written consent. Throughout such time, including at some of the Board meetings, upon information and belief, defendants Presley, Moore, Roper and Wade were provided with detailed reports from defendant Lynch and from Lumber Liquidators' Compliance Officer regarding the Company's sourcing initiatives, and the mills the Company was using in China.

170.    In addition, due to the reports they received regarding the mills in China, together with the fact that Lumber Liquidators operates as a single business segment and thus the wood that the Company buys and sells is the Company's "core product," defendants Presley, Moore, Roper and Wade knew or recklessly disregarded the fact that Lumber Liquidators' above-market profit margins were the result of buying tainted wood (whose price was below market precisely because it was obtained through unlawful sourcing or manufacturing) and not from any lawful "sourcing initiatives" implemented by the Company.

171.    In fact, defendants Presley, Moore, Roper and Wade knew or were reckless in not knowing of the market prices for wood that complied with regulations regarding formaldehyde promulgated by CARB, and knew that the below-market prices Lumber Liquidators was paying its mills in China could not be for truly CARB-compliant wood because truly CARB-compliant wood costs significantly more than what Lumber Liquidators was paying.

172.    The Audit Committee defendants (Presley, Moore, Roper and Wade) knew or were reckless in not knowing that Lumber Liquidators so-called sourcing initiatives was nothing more than an illegal scheme to increase margins through the purchase of hardwood flooring in violation of the Lacey Act, CARB Regulations and various other environmental rules and regulations. Consciously adopting, condoning or implementing an illegal business strategy breaches these defendants' fiduciary duty of loyalty and subjects them to a substantial likelihood of personal liability.  Thus, demand upon them would be futile.

### D.    Defendants Roper, Brock and Robinson Face a Substantial Likelihood of Liability as Compensation Committee Members

173.    Defendants Roper, Brock and Robinson are the current members of the Compensation Committee.  During the relevant period, they awarded excessive and unjust compensation to defendants Terrell, Daniels, Lynch, Sullivan and Schlegel.  Despite having direct responsibility for decisions concerning the Company's sourcing of wood from China, defendants Terrell, Daniels, Lynch, Sullivan and Schlegel were awarded the maximum amount of incentive-based compensation in 2013 by defendants Roper, Brock and Robinson.  This compensation was unjust because the Company's profit margins were only achieved through the importation of illegally sourced and non-CARB compliant wood.

174.    Moreover, egregiously, the Compensation Committee actually increased the maximum incentive-based compensation for defendants Terrell, Daniels, Lynch and Schlegel in 2013 to allow them to fully capitalize on the Company's unlawfully inflated profits.

175.    After they raised the ceiling on the maximum permissible payout to defendants Terrell, Daniels, Lynch and Schlegel, the Compensation Committee awarded the full 200% bonus to all such defendants.  Moreover, the Compensation Committee took its cue from defendant Lynch himself, one of the chief wrongdoers, as admitted in the Proxy: "In early 2013, Mr. Lynch reviewed the base salary for each executive officer, including Mr. Sullivan and himself, and presented the

Compensation Committee with recommendations regarding changes in the base salaries for such executive officers."

176. For 2012, the Compensation Committee had similarly raised the maximum amount of potential incentive-based compensation for defendants Lynch, Terrell, Daniels and Schlegel from 120% to 200% of base salary: "Additionally, with the exception of Mr. Sullivan, we increased the maximum potential annual cash bonus awards that our executives may achieve in 2013 from 120% of their bonus target to 200% of their bonus target in order to incent and reward outstanding performance."

177. For 2012, the Compensation Committee also based its payouts largely upon the recommendation of Lynch, as stated in the Proxy: "Mr. Lynch provided the Compensation Committee with recommendations regarding the proposed payout for each named executive officer, including Mr. Sullivan and himself, under the personal goals component of the Bonus Plan. His recommendations included an assessment of each named executive officer's performance against his personal goals and general contribution to the success of our operations." The 2012 payouts were based on criteria which included EPS goals for the Company. Because the Company exceeded the maximum target EPS established by the Compensation Committee, defendants Lynch, Terrell, Sullivan and Schlegel earned the full bonus award for the "corporate performance" aspect of the compensation matrix.

178. Defendants Roper, Brock and Robinson approved the unjust compensation despite knowing or consciously disregarding the fact that the Company's financial results, and their commensurate effect on defendants Lynch, Terrell, Daniels, Sullivan and Schlegel's income, were derived directly from the illegal acts alleged herein. Accordingly, defendants Roper, Brock and Robinson face a substantial likelihood of liability and demand upon them is futile.

### E. Demand Is Futile as to Defendant Lynch

179.    Demand is additionally futile as to defendant Lynch since, as the Company admits, defendant Lynch did not meet the standards for director independence given his employment at the Company as its former President and CEO.   Defendant Lynch is also interested, and therefore not independent or disinterested, because he has financially benefitted from his wrongdoing.   During 2013, when defendant Lynch was making false and misleading statements to inflate the Company's stock price, he reaped the benefit of his wrongdoing by being awarded huge compensation due to the allegedly strong performance of the Company that year.   As President and CEO at Lumber Liquidators, defendant Lynch made $6,866,883 in total compensation in 2013.   Of this total, $655,769 was received as a salary, $1,350,000 was received as a bonus, $3,374,996 was received in stock options, $1,469,911 was awarded as stock, and $16,207 came from other types of compensation.   This information is according to proxy statements filed for the 2013 fiscal year.

180.    Lynch is also interested because he is a named defendant in the related securities fraud class action complaint – *In re Lumber Liquidators Holdings, Inc. Sec. Litig.*, No. 4:13-cv-00157-AWA-DEM (E.D. Va.).   Defendant Lynch directly participated in making many of the statements alleged to be false and misleading and is alleged to have acted with scienter.   If defendant Lynch is found liable in the securities fraud class action complaint, then the Company will be liable for securities fraud under §20A of the Securities Exchange Act of 1934 and under theories of *respondeat superior*.

### F. Demand Is Futile as to Defendant Sullivan

181.    Demand is additionally futile as to defendant Sullivan because defendant Sullivan is not independent and objective.   He is the Company's founder and has been Chairman of the Board since the Company's inception in 1994.   More importantly, defendant Sullivan had direct knowledge of the Company's unlawful sourcing of wood from mills in China.   The Company's website notes

defendant Sullivan's direct involvement in the Company's sourcing initiatives: "He [Sullivan] currently advises and supports our marketing and advertising departments and *is active in our sourcing initiatives*. He is involved with employee development initiatives and plays a key role in setting and maintaining our corporate culture." Moreover, the Company's 2014 Proxy Statement also concedes Mr. Sullivan's involvement in executive-level, CEO-type decisions, and as a result Lumber Liquidators admits that defendant Sullivan does not meet standards for director independence: "Under the current structure, both the chairman and chief executive officer have responsibility for our business strategy and financial performance. Our chairman focuses on strategic matters relating to our marketing efforts and certain merchandising opportunities, while the chief executive officer is responsible for our operations and day-to-day management direction and execution."

182.    Defendant Sullivan is also not independent and disinterested because he owns the real estate the Company leases as its main offices in Virginia. As disclosed in the Company's 2014 Proxy Statement:

> As of March 31, 2014, we lease our Toano finishing, distribution and headquarters facility, which includes a store location, supplemental warehouse space adjacent to one of our store locations and 28 of our other store locations from F9 Properties, LLC f/k/a ANO, LLC ("F9"), a company that is wholly owned by Mr. Sullivan. The operating lease for our Toano facility has a base period that runs through December 31, 2019. Our store leases generally have five-year base periods and one or more five-year renewal periods. Our rent expense attributable to F9 was $2.9 million in 2013 and we expect a similar rent expense attributable to F9 in 2014. The future minimum payments under our leases with F9 as of December 31, 2013 total approximately $14.2 million.

### G.    Demand Is Futile for Additional Reasons

183.    As particularized herein, to properly prosecute this lawsuit, Lumber Liquidators' directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they will not do. A majority of the defendants are exposed to a substantial likelihood of liability for

- 63 -

failing to cause Lumber Liquidators to comply with the Lacey Act, CARB Regulations, and other federal and state environmental and consumer safety laws and the improper misrepresentations to shareholders.  Thus, demand on the director defendants is futile, and therefore, excused.

184.    The director defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Likewise, these defendants have and will continue to receive substantial remuneration predicated upon Lumber Liquidators' results.  The acts complained of herein have resulted in economic benefits to defendants through their increased and continuing compensation – without corresponding recognition or accounting for the correlated liability and risk that Lumber Liquidators was subject to as a result of the illegal scheme.  The director defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into Lumber Liquidators' balance sheet.  Thus, demand on the director defendants is futile, and therefore, excused.

185.    Demand on the director defendants is futile because, when given an opportunity to undertake action to correct the violations of federal and state law by Lumber Liquidators, the Board did nothing and merely continued to falsely state in SEC filings that Lumber Liquidators was in full compliance with such laws and regulations.

186.    Defendants Brock, Lynch, Moore, Presley, Robinson, Roper, Taylor and Wade also lack independence because they cannot objectively consider a demand to sue defendant Sullivan because doing so would pose a threat of jeopardizing the Company's lease from defendant Sullivan's company.

187.     Lumber Liquidators' officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' ("D&O") liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lumber Liquidators. However, the D&O liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Lumber Liquidators against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Lumber Liquidators, there would be no D&O insurance protection and, thus, they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the director defendants is futile, and therefore, excused.

## COUNT I

### Breach of Fiduciary Duty of Loyalty
### (and Candor and Good Faith)
### (All Defendants)

188.     Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-187.

189.     Defendants owed Lumber Liquidators and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, defendants, when faced with a known duty to act, here Lumber Liquidators' legal duty to comply with state and federal laws and other environmental and consumer protection rules and regulations related to the importation, manufacture, sale and distribution of Chinese flooring, were duty bound to proactively ensure Lumber Liquidators' compliance with these laws.

- 65 -

190.    However, defendants implemented, adopted and condoned a business strategy based on widespread illegal activity over the course of several years.

191.    As a result of defendants' disloyalty, Lumber Liquidators has been injured and incurred damages in an amount to be determined at trial.  Accordingly, Lumber Liquidators is entitled to recover compensatory damages.  In addition, because the acts and omissions of the defendants were undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their civil obligations, Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## COUNT II

### Corporate Waste
### (All Defendants)

192.    Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-191.

193.    As a result of the foregoing misconduct, defendants have caused Lumber Liquidators to waste valuable corporate assets.

194.    As a direct and proximate result of defendants' corporate waste, Lumber Liquidators has sustained and continues to sustain significant damages in an amount to be determined at trial.  As a result of the misconduct alleged herein, defendants are liable to the Company for compensatory damages in the amount of the corporate waste caused by defendants' wrongful acts and omissions.  In addition, because the acts and omissions of the defendants were undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their civil obligations, Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## COUNT III

### Unjust Enrichment
### (All Defendants)

195.     Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-194.

196.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Lumber Liquidators.  Defendants were unjustly enriched as a result of the salaries, fees, stock options and other payments they received while breaching their fiduciary duty owed to Lumber Liquidators.

197.     Plaintiff, as a shareholder of Lumber Liquidators, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other improper payments obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

198.     As a result of defendants' unjust enrichment, Lumber Liquidators has been injured and is entitled to damages.

## COUNT IV

### Statutory Conspiracy
### (In Violation of Va. Code Ann. §§18.2-499 and 18.2-500)
### (All Defendants)

199.     Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-198.

200.     By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken and concerted together for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

201.    By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have attempted to procure the participation, cooperation, agreement or other assistance of other persons to enter into a combination, association, agreement, mutual understanding or concert for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

202.    The acts and omissions of the defendants complained of in this Count have been undertaken in order to serve the defendants' respective personal pecuniary interests, including without limitation the extensive profiteering from sales of Company stock owned by the defendants at artificially inflated prices, which interests are separate and distinct from, and indeed contrary to, the interests of the Company.

203.    The acts and omissions of the defendants complained of in this Count have been undertaken without justification.

204.    The acts and omissions of the defendants complained of in this Count have caused, are presently causing, and without intervention by this Court, will in the future continue to cause, irreparable harm to the Company and its shareholders, as described herein.  Plaintiffs and the Company's non-defendant shareholders have no adequate remedy at law to address the irreparable injury caused, being caused, and to be caused to them, including without limitation the grievous damage being done to the reputation of the Company and its ability to continue to conduct ordinary business operations.

205.    The Company has been injured as a direct and proximate result of the acts and omissions complained of herein, and has suffered damages in an amount to be determined at trial.

206.    Pursuant to Va. Code Ann. §18.2-500, plaintiffs are entitled to entry of temporary and permanent injunctions restraining the defendants from continuing to take the acts and omissions described in this Complaint.

- 68 -

207.     Pursuant to Va. Code Ann. §18.2-500, Lumber Liquidators is entitled to recover three times its actual damages incurred, plus reasonable attorneys' fees and costs herein expended.

## COUNT V

## Common-law Conspiracy
## (All Defendants)

208.     Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-207.

209.     By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken and concerted together for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

210.     By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have attempted to procure the participation, cooperation, agreement or other assistance of other persons to enter into a combination, association, agreement, mutual understanding or concert for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

211.     The acts and omissions of the defendants complained of in this Count have been undertaken in order to serve the defendants' respective personal pecuniary interests, including without limitation the extensive profiteering from sales of Company stock owned by the defendants at artificially inflated prices, which interests are separate and distinct from, and indeed contrary to, the interests of the Company.

212.     The acts and omissions of the defendants complained of in this Count have been undertaken without justification.

213.     The Company has been injured as a direct and proximate result of the acts and omissions complained of herein, and has suffered damages in an amount to be determined at trial.

- 69 -

214.    The acts and omissions of the defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in the Company's favor and against all defendants, save and except nominal defendant Lumber Liquidators, as follows:

A.    Declaring that plaintiffs may maintain this action on behalf of Lumber Liquidators and that plaintiffs are adequate representatives of the Company;

B.    Declaring that the defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Lumber Liquidators;

C.    Determining and awarding to Lumber Liquidators the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with prejudgment and post judgment interest thereon;

D.    Awarding to Lumber Liquidators, jointly and severally from the defendants, three times the amount of actual damages incurred by the Company as a result of defendants' wrongful acts and omissions;

E.    Determining and awarding to Lumber Liquidators punitive and exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.    Requiring Lumber Liquidators to establish corporate policies and procedures prohibiting the use of Chinese manufacturers of its products;

G.    Prohibiting Lumber Liquidators from using wood or wood products from the RFE;

H.    Requiring Lumber Liquidators to establish corporate policies and procedures to ensure compliance with CARB standards for all Lumber Liquidators' flooring products;

I.    Ordering disgorgement and payment to Lumber Liquidators of all compensation and profits made by defendants, and each of them, at any time during which such defendant was breaching fiduciary duties owed to the Company and/or committing, or aiding or abetting the commitment of, corporate waste;

J.    Awarding plaintiffs the costs and disbursements incurred in this action, including reasonable attorneys' and experts' fees, costs and expenses; and

K.    Granting such other and further relief as this Court may deem just and proper.

## XI.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  June 26, 2015

/s/
Brett A. Spain (VSB No. 44567)
Counsel for Amalgamated Bank, as Trustee
for the Longview 600 Small Cap Index Fund,
Derivatively on behalf of Lumber
Liquidators Holdings, Inc.
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510
Telephone: (757) 628-5500
Facsimile: (757) 628-5569
bspain@wilsav.com

Attorneys for Plaintiffs

DARREN J. ROBBINS
BENNY C. GOODMAN III
ERIK W. LUEDEKE
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
Facsimile 619/231-7423
darrenr@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

EKATERINI M. POLYCHRONOPOULOS
ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
Facsimile 415/288-4534
katerinap@rgrdlaw.com

Attorneys for Plaintiffs (motions for admission *pro hac vice* to be filed)

- 72 -

## VERIFICATION

I, Thomas B. O'Donnell, hereby declare as follows:

I am Senior Vice-President and Head of Equities at Amalgamated Bank. Plaintiff Amalgamated Bank, as Trustee for the LongView 600 Small Cap Index Fund, currently holds Lumber Liquidators Holdings, Inc. common stock, was a shareholder at the time of the wrongdoing complained of and has continuously remained a shareholder since 2009.

Plaintiff has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of Lumber Liquidators. Plaintiff, or its representative, has read the Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty of Loyalty, Corporate Waste, Unjust Enrichment and Conspiracy (the "Complaint"). The facts set forth in the Complaint that relate to plaintiff's acts and deeds are true to my own knowledge. The other facts set forth in the Complaint are true and correct to the best of plaintiff's knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Date: ____6/26/15____

AMALGAMATED BANK, as Trustee for the
LongView 600 Small Cap Index Fund

By: _____Thomas B. O'Donnell_____
Thomas B. O'Donnell

I:\Admin\CptDraft\Derivative\CPT Lumber Liquidators-VERIFICATION.docx

DocuSign Envelope ID: 2BD1018B-2AE8-44C3-B721-EADBF85251BE

# **VERIFICATION**

I, Phuc Doan, verify that I have reviewed the foregoing Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty of Loyalty, Corporate Waste and Unjust Enrichment, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  June 25, 2015

DocuSigned by:

*Phuc Doan*

090E4630A8B342D...

(Signature of Phuc Doan)

VERIFICATION

I, R. Andre Klein, verify that I am a shareholder of Lumber Liquidators.  I have reviewed the allegations in this Verified Consolidated Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __25__, 2015.

_____
R. Andre Klein

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of June, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

*Counsel for R. Andre Klein, Derivatively on*
*Behalf of Lumber Liquidators, Inc.*
    David W. Thomas
    MichieHamlett
    500 Court Square, Ste. 300
    P. O. Box 298
    Charlottesville, Virginia 22902
    (202) 973-8800 Telephone
    (202) 973-8899 Facsimile
    dthomas@michiehamlett.com

*Counsel for Phuc Doan*
    David W. Thomas
    MichieHamlett
    500 Court Square, Ste. 300
    P. O. Box 298
    Charlottesville, Virginia 22902
    (202) 973-8800 Telephone
    (202) 973-8899 Facsimile
    dthomas@michiehamlett.com

    Edward Kyle McNew
    MichieHamlett
    500 Court Square, Ste. 300
    P. O. Box 298
    Charlottesville, Virginia 22902
    (434) 951-7200 Telephone
    (434) 951-7218 Facsimile
    kmcnew@michiehamlett.com

*Counsel for Macon F. Brock, Jr., Robert M. Lynch, Douglas T. Moore,*
*John M. Presley, Peter B. Robinson, Martin F. Roper, Thomas D. Sullivan,*
*Jimmie L. Wade, Nancy M. Taylor, Daniel E. Terrell, Carl R. Daniels, Jr.,*
*Jeffrey W. Griffiths, William K. Schlegel and Lumber Liquidators Holdings, Inc.*
    Lyle Roberts
    Cooley LLP (DC)
    1299 Pennsylvania Ave., NW, Suite 700
    Washington, DC 20004-2400
    (202) 842-7855 Telephone
    (202) 842-7899 Facsimile
    lroberts@cooley.com

_/s/_____
Brett A. Spain (VSB No. 44567)
Counsel for Amalgamated Bank, as Trustee
for the Longview 600 Small Cap Index Fund,
Derivatively on behalf of Lumber
Liquidators Holdings, Inc.
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510
(757) 628-5500 Telephone
(757) 628-5566 Facsimile
bspain@wilsav.com

Darren J. Robbins, Esquire
Benny C. Goodman, III (admitted pro hac vice)
Erik W. Luedeke (admitted pro hac vice)
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Ste. 1900
San Diego, California 92101
(619) 231-1058 Telephone
(619) 231-7423 Facsimile
darrenr@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

Ekaterini M Polychronopoulos
(admitted pro hac vice)
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Ste. 1800
San Francisco, California 94104
(415) 288-4545 Telephone
(415) 288-4534 Facsimile
katerinap@rgrdlaw.com